Clyde F. DEAL, Petitioner,

v.

L. Jon KEARNEY, individually and as assignee of Insurance Company of North America, Cigna, Inc., Lutheran Hospitals & Homes Society of America, Inc., its affiliates, subsidiary, parent and successor corporations, Kodiak Island Hospital, as assignors to their rights of indemnity of contribution and as subrogees to the rights of L. Jon Kearney, Respondents.

No. S–4651.

Supreme Court of Alaska.

May 14, 1993.

Donna Burton, Delaney, Wiles, Hayes, Reitman & Brubaker, and Roger F. Holmes, Biss & Holmes, Anchorage, for petitioner.

John S. Hedland, Sara E. Heideman, Hedland, Fleischer, Friedman, Brennan & Cooke, Anchorage, for respondents.

Dan A. Hensley, Paula M. Jacobson, Luce & Hensley, Anchorage, for amicus curiae, Alaska Academy of Trial Lawyers.

Before RABINOWITZ, C.J., and BURKE and COMPTON, JJ.

## OPINION

BURKE, Justice.

This matter is before the court on a petition for review. *See* Alaska R.App.P. 402 and 403. Clyde F. Deal, M.D., the petitioner, seeks reversal of the superior court's denial of his motion for summary judgment, on claims made against him by a former patient, L. Jon Kearney, for indemnity, subrogation and contribution. Such claims were assigned to Kearney by Lutheran Hospitals & Homes Society of America, Inc., as part of a settlement agreement.

In his motion for summary judgment before the superior court, Dr. Deal first argued that the assigned claims were based on non-assignable causes of action, and that the assignment of those claims to Kearney was contrary to public policy. Dr. Deal next argued that his own actions were immune from liability under Alaska Statute 09.65.090(a), sometimes called the "Good Samaritan" statute. Dr. Deal renews these arguments here.

### I

After Kearney suffered a life-threatening injury, he was taken by ambulance to the emergency room ("ER") of Kodiak Island Hospital ("KIH"). When he arrived at KIH, at 3:45 p.m. on September 16, 1984, Kearney was examined by the on-call ER physician, Kevin Creelman, M.D., a family practitioner. Dr. Creelman determined that a surgical consult was necessary and called in Dr. Deal, a surgeon with staff privileges at KIH. After ordering certain tests, Dr. Deal was of the opinion that Kearney could not survive a transfer to Anchorage. Dr. Deal then performed emergency surgery which lasted nine to ten hours, and ended the following morning.

Dr. Deal gave numerous verbal and written orders following the surgery, regarding the post-operative care to be given to Kearney. Dr. Deal contends that one such order, given verbally to a nurse, was that arrangements be made for a medivac flight to Anchorage by 12:00 noon, on September 17. Kearney, however, was not moved until after 5:00 pm.

Kearney's condition upon arrival at Providence Hospital in Anchorage was so critical that Dr. Marbarger, the physician to whom Kearney was transferred, believed that Kearney was going to die. Dr. Marbarger performed vascular surgery, and on September 18, Kearney underwent the first of a series of amputations. Eventually, his right leg was amputated at the hip, and his left leg was amputated at the knee.

Kearney claims that Dr. Deal was negligent. Specifically, he contends that Dr. Deal negligently failed to order a medivac flight or, if such order was given, was negligent in failing to see that it was properly carried out. The delay in transporting him to Anchorage, according to Kearney, resulted in the loss of blood circulation and tissue death in both legs, so that they required amputation upon his arrival in Anchorage.

Kearney brought suit against Lutheran Hospitals & Homes Society of America, Inc. ("LHHS"), the administrator of KIH, on September 12, 1986. In his complaint and later amended complaint, Kearney alleged, *inter alia,* that LHHS was negligent for its failure to promptly evacuate him to Anchorage. Neither Kearney nor LHHS brought any action against Dr. Deal at that time.

On October 2, 1989, LHHS and Kearney entered into a settlement agreement whereby LHHS paid $510,000 to Kearney. At the same time, LHHS and Kearney executed a document in which Kearney released LHHS, Dr. Deal, and other health care providers, from liability. In return, LHHS assigned to Kearney its rights to indemnity, equitable subrogation, and contribution against Dr. Deal. *See* AS 09.16.010(d). Shortly thereafter, Kearney and LHHS filed a stipulation for dismissal of Kearney's negligence action.

Kearney, as assignee of the rights of LHHS, brought the present action against Dr. Deal on November 1, 1989, alleging that LHHS had rights of indemnity, contribution, or subrogation against Dr. Deal

arising from Dr. Deal's negligent acts or omissions in the care given Kearney on September 16–17, 1984. Dr. Deal moved for summary judgment on two grounds: First, he argued that the assignment of LHHS's claims to Kearney was invalid. Second, Dr. Deal claimed to be immune from suit under the Good Samaritan statute.

The trial court denied Dr. Deal's motion for summary judgment, ruling that the claims brought against him were properly assigned to Kearney, and that the Good Samaritan statute was not applicable to Dr. Deal because he was acting under a pre-existing duty to render the emergency care provided Kearney. Dr. Deal petitioned for review, and his petition was granted. We turn now to the merits.

## II

### A. The trial court did not err when it concluded that the assignment to Kearney of LHHS's claims for indemnity, subrogation, and contribution did not violate public policy

The first issue that we address is whether, as Dr. Deal contends, the assignment to Kearney of claims for indemnity, subrogation and contribution is an assignment which violates the public policy against champerty and maintenance. The answer to this question, we believe, turns on whether Kearney should be considered an injured party with respect to these claims, or a stranger to the particular transaction between LHHS and Dr. Deal.

In *Croxton v. Crowley Maritime Corp.,* 758 P.2d 97, 99 (Alaska 1988), we recognized an exception to the common law prohibition against assignment of personal injury claims when a cause of action for wrongful death, assigned by operation of law to the deceased's employer, was *reassigned* by the employer to the estate of the deceased. We held that such an assignment does not violate the public policy against champerty and maintenance, stating:

[T]he main purposes of the general rule of non-assignability of claims for personal injury are not offended by this type reassignment. Those purposes, to prevent unscrupulous strangers to an occurrence from preying on the deprived circumstances of an injured person, and to prohibit champerty, simply have no applicability where the assignment is to the injured person himself.

*Id.* at 99, quoting *Caldwell v. Ogden Sea Transportation,* 618 F.2d 1037, 1048 (4th Cir.1980).

Dr. Deal notes this exception but distinguishes the present case by contending that Kearney's claims do not fall within the specific exception in *Croxton.* Dr. Deal argues that Kearney never owned the original actions and therefore could not *re* acquire them. Dr. Deal contends that implied indemnity, equitable subrogation and contribution are tort claims personal to LHHS, and that Kearney is a legal stranger to the relationship between Dr. Deal and LHHS. Dr. Deal further notes that Kearney, under this assignment, is not seeking recovery against Dr. Deal for Kearney's own damages resulting from Dr. Deal's alleged medical negligence.[1] Any proceeds from this action would constitute profit to Kearney rather than reimbursement to Kearney for damages he incurred as a result of any negligence on Dr. Deal's part.

In reply, Kearney argues that the claims for contribution, indemnity, or subrogation are not personal tort claims at all; instead, they are claims grounded in equity or implied contract. *See, e.g. Jackson v. Cupples,* 239 Md. 637, 212 A.2d 273 (1965); *City of New York v. Keene Corp.,* 132 Misc.2d 745, 505 N.Y.S.2d 782 (N.Y.1986); *Kahn v. Weldin,* 653 P.2d 1268 (Or.App. 1982); *Sydenstricker v. Unipunch Prod., Inc.,* 169 W.Va. 440, 288 S.E.2d 511 (1982) (doctrines of implied indemnity and contribution are based upon principles of equity). Kearney further argues that, even if the claim for contribution or indemnity could be characterized as a "tort," arising out of injuries committed by joint tortfeasors

---

1. Kearney filed a separate direct personal injury action for malpractice against Dr. Deal on June 25, 1991, nearly seven years after Kearney's accident.

against each other, it could not be characterized as a tort for personal injury, because the "victim" did not sustain an injury to its "person." Rather, the injury would be an incurrence of a monetary obligation to that party, the claim for which would be clearly assignable.

We think Kearney has the better argument. Kearney, while not the party directly injured with respect to the assigned claims, is by no means a stranger to the litigation.[2] Further, we agree with Kearney that, regardless of whether the assigned claims are thought of as originating in tort or contract, the "injury" involved is not a "personal injury" subject to the general rule on non-assignability. We hold that the assignment to Kearney by LHHS, of the latter's claims for indemnity, contribution, and subrogation, does not violate the public policy of this state against champerty and maintenance.

**B. The trial court did not err when it ruled that Dr. Deal is not immune from liability under the Good Samaritan statute, AS 09.65.090(a)**

The superior court held that the immunity provided by the Good Samaritan statute is unavailable to physicians with a pre-existing duty to respond to emergency situations. The court concluded that Dr. Deal was under a pre-existing duty in the instant case by virtue of his contract with KIH, the duty being part of the consideration which Dr. Deal gave to KIH in exchange for staff privileges at the hospital. The court further found that the Good Samaritan statute did not apply to Dr. Deal in any event, because the actions allegedly constituting malpractice occurred during the follow-up care and treatment given Kearney, after surgery. By then, the court reasoned, Dr.

Deal had become Kearney's treating physician, and was no longer responding to an emergency situation.

**1. The trial court did not err in ruling that AS 09.65.090(a) does not apply to physicians already under a duty to provide medical care**

■ Alaska Statute 09.65.090(a) states,

A person at a hospital or any other location who renders emergency care or emergency counseling to an injured, ill, or emotionally distraught person who reasonably appears to the person rendering the aid to be in immediate need of emergency aid in order to avoid serious harm or death is not liable for civil damages as a result of an act or omission in rendering emergency aid.

We interpreted an earlier version of the statute to exclude persons under a pre-existing duty from the statute's protection. *Lee v. State*, 490 P.2d 1206, 1210 (Alaska 1971), *overruled on other grounds by Munroe v. City Council of Anchorage*, 545 P.2d 165, 170 n. 11 (Alaska 1976).[3] We now address for the first time the issue of whether the immunity found in the amended statute applies to persons under a pre-existing duty to provide emergency care.[4]

■ The legislature amended AS 09.65.-090 in 1976 to include among those potentially immune from civil liability for emergency aid "[a] person at a hospital or any other location who renders emergency care." The legislature clearly intended this provision to encourage health care providers, including medical professionals, to administer emergency medical care, whether in a hospital or not, to persons who are not

---

2. *Compare: Ogle v. Craig Taylor Equipment Co.,* 761 P.2d 722 (Alaska 1988); *Fellows v. Tlingit–Haida Reg. Elec. Auth.,* 740 P.2d 428 (Alaska 1987).

3. The statute interpreted in *Lee v. State,* 490 P.2d 1206 (Alaska 1971), read:
   (a) A person, who, without expecting compensation, renders care to an injured or sick person, who appears to be in immediate need of aid is not liable for civil damages as a result of an act to or omission in rendering

emergency care, or as a result of an act or failure to act to provide or arrange for further medical treatment or care for the injured person.

4. The independent judgment standard of review is exercised by this court when the interpretation and application of a statute is at issue. *Hertz v. Carothers,* 784 P.2d 659, 660 (Alaska 1990), citing *Barcott v. Department of Public Safety,* 741 P.2d 226 (Alaska 1987).

their patients by immunizing them from civil liability.

The legislative history favors Kearney's position. The 1976 version of the Good Samaritan statute was based on recommendations of the Medical Malpractice Insurance Commission ("Commission"). *See* Report of the Governor's Medical Malpractice Insurance Commission ("Commission Report"), Oct. 1, 1975. One of the recommendations made by the Commission included the following:

> Medical professionals should be immune from liability to a person who is not his patient for administering emergency medical care where the giving of immediate aid appears to be the only alternative to death or serious bodily injury or harm.

Commission Report at 5. The clear inference of this recommendation is that those with a pre-existing duty would not be covered by the statute.

The October 31, 1975, supplement to the Commission Report added language which would have limited the immunity of persons "at a hospital or at any other location" who provided emergency aid "unless the circumstances are such that remuneration for the services would normally be expected." *See* Commission Supplement at 25. In the final amendment as enacted in 1976, the legislature deleted both the Commission's suggested reference to expected remuneration and the former statute's limitation of immunity to those who rendered care "without expecting compensation."

Dr. Deal equates an expectation of compensation with the existence of a pre-existing duty. He therefore contends that the legislature's decision to omit any reference to compensation demonstrated the legislature's intent *not* to limit immunity under AS 09.65.090 to persons not having a pre-existing duty to render emergency care. Such an argument, however, assumes a causal connection between compensation and pre-existing duty which simply does not exist.

Dr. Deal further argues that the extension of immunity even to physicians with a pre-existing duty serves a legitimate public interest and is consistent with public policy. He supports this assumption by citing various other statutes granting immunity to other classes of persons in a position to render emergency aid, paid or otherwise, including veterinarians (AS 09.65.097), emergency medical technicians (AS 18.08.-086), and other rescue groups such as ski patrollers (AS 09.65.090(b) (amended 1988). However, in the case of veterinarians, the wording is essentially identical to that of the Good Samaritan statute and thus does not independently support Dr. Deal's proposition that either statute necessarily immunizes persons with a pre-existing duty from liability.

The public policy grounds underlying the other two statutes can be readily distinguished from those underlying AS 09.65.-090(a). In the case of emergency medical technicians, although they clearly have a pre-existing duty to provide aid, without statutory protection from liability, their very existence would be threatened, and there is a clear public interest in having trained and certified emergency medical personnel.[5] In the case of rescue groups covered under AS 09.65.090(b), the legislature was careful to require that to receive immunity a person, *"regardless of whether the member is under a preexisting duty to render assistance,"* must be a volunteer "who is paid not more than $10 a day and a total of not more than $500 a year." Indeed, Kearney cites this same statutory subsection (b) to support his argument that the legislature deliberately did *not* extend immunity to those with a pre-existing duty under subsection (a), noting that the 1988 amendment adding subsection (b) otherwise would have been unnecessary because such volunteers already would have been included under subsection (a).

Good Samaritan statutes traditionally were designed to protect persons from civil

---

**5.** *See* Danny R. Veilleux, Annotation, *Construction and Application of "Good Samaritan" Statutes,* 68 A.L.R.4th 294, 298 (1989) (Statutes covering emergency medical technicians, hospital

"rescue teams," or ambulance operators are discussed separately from Good Samaritan statutes "since these subjects address specific problems requiring separate attention.").

liability for negligent acts or omissions committed while voluntarily providing emergency assistance. *See* Danny R. Veilleux, Annotation, *Construction and Application of "Good Samaritan" Statutes*, 68 A.L.R.4th 294, 299–300 (1989). "Courts have generally held that Good Samaritan statutes do not apply to persons having a pre-existing duty to render [emergency] aid, often reasoning that the added inducement of statutory immunity is not necessary to encourage them to provide the emergency care." *Id.* at 302. Decisions thus have focused on determining whether a person had a pre-existing duty.

In *Colby v. Schwartz*, 78 Cal.App.3d 885, 144 Cal.Rptr. 624 (Cal.1978), the defendant doctors operated on a patient in an ER as part of their normal course of practice as members of the hospital emergency call panel. The court held that the doctors were not entitled to the protection of the state's Good Samaritan statute because they were not acting as volunteers but, rather, were acting in the normal course of their practice. The court went on to note:

> Physicians, like defendants, who treat patients requiring immediate medical care as part of their normal course of practice do not need the added inducement that immunity from civil liability would provide. Moreover, excusing such physicians of their negligence could have the adverse effect of lowering the quality of their medical care without justification. And further, to extend immunity to such physicians would deny an overly broad spectrum of malpractice victims of their legal remedies.

78 Cal.App.3d at 893, 144 Cal.Rptr. at 628. *See* 68 A.L.R.4th at 323.

The Georgia Court of Appeals recently held that their Good Samaritan statute was directed at persons who are not under some pre-existing duty to rescue. The court noted that "public policy would be ill-served if [the doctor] were relieved of the usual physician's duty of care and given immunity in [a case where she had a particular employment duty to aid the patient at the hospital]." *Henry v. Barfield*, 186 Ga.App. 423, 367 S.E.2d 289, 290 (1988) (citing *Clayton v. Kelly*, 183 Ga.App. 45, 357 S.E.2d 865, 868–69 (1987)). The court went on to state that "[i]f there was no prior duty to respond and there was no prior doctor-patient relationship, one is not created by the event of the emergency. But clearly the occurrence of an emergency will not invoke the immunity, if it was the doctor's duty to respond to the emergency." *Id.*

Courts in other cases have held that doctors were entitled to claim immunity under a Good Samaritan statute where they provided emergency medical care in a hospital that was not part of the doctor's express or customary hospital function and therefore did not have a pre-existing duty to treat the patients. *See e.g., McKenna v. Cedars of Lebanon Hospital, Inc.*, 93 Cal.App.3d 282, 155 Cal.Rptr. 631 (Cal.1979); *Matts v. Homsi*, 308 N.W.2d 284 (Mich.App.1981); *see generally* 68 A.L.R.4th 323–26.

■ In all of the above cases, the courts have found that a pre-existing duty to render emergency care denied physicians the protection of their Good Samaritan statutes. Dr. Deal attempts to distinguish the Alaska statute from these other states' statutes by noting that these other statutes contain either a provision regarding the actor's "good faith" or the absence of payment or compensation. However, the question of expectation of compensation does not constitute a *per se* rule for determining whether a rescuer had a pre-existing duty. Rather, the essential issue is whether the individual has undertaken a responsibility. *See City of Kotzebue v. McLean*, 702 P.2d 1309, 1313 (Alaska 1985) (quoting *Restatement (Second) of Torts*, §§ 323 and 324A).

The trial court was correct in holding that the Alaska Good Samaritan statute, AS 09.65.090(a), does not extend immunity to physicians who have a pre-existing duty to render emergency care.

**2. The trial court erred when it ruled that Dr. Deal, as a matter of law, was under a pre-existing duty to provide emergency room consultation and assistance**

■ The superior court ruled, as a matter law, that Dr. Deal was under a pre-

existing duty to render emergency aid to Kearney, by virtue of his contract with KIH, and that he is, therefore, not entitled in the present litigation to claim the protection of the Good Samaritan statute. The Bylaws of the Medical and Dental Staff of the Kodiak Island Hospital in effect in 1984, when Kearney's accident occurred, stated in pertinent part as follows:

Article III:  MEDICAL STAFF MEMBERSHIP

. . . .

Section 3.  Conditions and Duration of Appointment.

. . . .

D.  As a condition to membership on the medical staff, each practitioner shall acknowledge his obligation to provide continuous care and supervision of his patient; to abide by the medical staff bylaws, rules and regulations; to accept consultation assignments; and to participate in rotating staffing of the Emergency Room *in accordance with established policies.*

Bylaws of the Medical and Dental Staff, Oct. 28, 1983.  (Emphasis added.)

This section of the bylaws was replaced with new wording adopted by the KIH medical staff in 1985 and again in 1986. While the court must interpret the bylaws in effect in September 1984, we examine the new wording in the hope that it may shed some light on what was meant by "established policies."  The section adopted in 1985 stated:

Section 3.  Conditions of Appointment

. . . .

d.  ... The Emergency Room Call Policy is as follows:  All primary care physicians—family practice and general practice will rotate call.

Bylaws of the Medical and Dental Staff, adopted by medical staff on Apr. 17, 1985.

The bylaws were further amended the following year.  The above section as adopted in 1986 by the active medical staff states:

Section 3.  CONDITIONS AND DURATION OF APPOINTMENT

. . . .

D.  Each practitioner shall acknowledge his obligation to provide continuous care and supervision of his patients; to abide by the Medical Staff Bylaws, Rules and Regulations; to accept consultation assignments.

E.  Each general practitioner or Family Physician on the Medical Staff shall serve in rotation of first call in the Emergency Room in accordance with established policies.

F.  Each specialist shall serve as consultant when requested by the physician on first call in the Emergency Room.  Consultants may rotate call when more than one is resident in the community.

Bylaws of the Medical and Dental Staff, Feb. 12, 1987.

The Rules and Regulations adopted in 1982 and in effect in 1984 are not particularly illuminating as to the medical staff's responsibilities with respect to emergency care.  However, they do define and describe the term "consultation."  The bylaws do not specifically state, until the 1987 version, that specialists shall serve as consultants when requested by the physician on first call in the ER, but it is instructive to note that the rules and regulations do make an exception to the general recommendations regarding consultation in an emergency situation.

The 1982 Rules and Regulations state in pertinent part:

G.  CONSULTATION

1.  The term "consultation" means an opinion from a physician regarding the diagnosis, management or disposition of a patient.

. . . .

6.  Consultation is strongly recommended under the following circumstances *except in emergencies where the delay occasioned by such consultation would likely be harmful to the patient:*

A.  Serious or critical patients where the diagnosis is obscure.

B.  Serious or critical patients not improved after 48 hours of treatment.

C.  When optimal treatment is in doubt.

D. Where there is a question of criminal action.

E. Acute myocardial infarction complicated by serious rhythm disturbance or cardiogenic shock.

F. Hysterectomy in women of child bearing age.

G. Prolonged labor (more than 36 hours).

H. Premature rupture of membranes (greater than 24 hours).

I. First ceasarean [sic] section (consultation may not be the surgeon).

J. Newborn less than four pounds or with 5 minute Apgar less than 6.

(Emphasis added.) The Rules and Regulations of Kodiak Island Hospital Medical Staff.

An interpretation of the emphasized language in the section above is that the on call physician in the ER has the duty to provide emergency care. Additionally, if a specialist is called in solely to provide an opinion, such delay should not be undertaken if it would be harmful to the patient.

However, it is unclear under the above rules what the ER physician should do in the case of an emergency, such as Kearney's, where the physician clearly does not have the expertise to proceed with the appropriate treatment. Does the above language imply that *mere* consultation would be inappropriate? In other words, does the combination of the above definition of consultation with the wording of the 1983 bylaws at III(3)(D), which separates the acceptance of consultations from ER staffing, create a duty for specialists to treat emergency patients whose treatment requires their particular expertise?

Dr. Deal contends that there are unresolved issues of material fact that go to whether the hospital bylaws and rules and regulations created a pre-existing duty for him to treat Kearney. The trial court concluded:

[B]y contract with the hospital, specialists such as Dr. Deal were relieved from regular rotational on-call duty in the emergency room of the hospital, and instead, Dr. Deal as such a specialist agreed that he would not serve rotational emergency room on-call duty, but instead would be on-call to respond to the general practitioners who were on duty in the emergency room and consult with such emergency room physicians in lieu of doing regular rotational emergency room on-call service.

Tr. of Decision on Record, 3AN–89–9188 CI, June 14, 1991. Dr. Deal claims that the trial court erred by concluding as a matter of law that a duty to consult encompasses a duty to provide emergency services or post-operative care. He argues that it should be a question of fact as to whether surgery and post-surgical care are included within the framework of the word "consult."

In support of his contention that a genuine issue of fact remains, Dr. Deal claims that Dr. Juergens' testimony demonstrates that the emergency room staffing policy in *effect* in 1984, although not formally adopted until April 1985, was the same as that in effect in 1988. *See* Juergens' deposition, *Kearney v. LHHS*, June 2, 1988, at 7–8. Dr. Deal further argues that this policy required only family and general practitioners to staff the ER and that specialists would serve solely as consultants upon request by the physician on first call in the ER.

Kearney argues that the bylaws in fact create a legal pre-existing duty for the specialists. He claims that the "established policies" referred to in the 1983 bylaws, III(3)(D), "were that general practitioners took initial emergency room call, and specialists had to respond to calls from the general practitioner when his or her expertise was required to treat the emergency patient." Kearney then cites testimony from Drs. Deal, Creelman, and Juergens to support this interpretation.

■ Given the ambiguity of the language in the bylaws and rules and regulations in effect at the time of Kearney's accident and Dr. Deal's alleged malpractice, we conclude that the trial court erred in determining, as a matter of law, that these bylaws and rules created a pre-existing duty which deprives Dr. Deal of the

right to claim that he is immune under the Good Samaritan statute. Although the factual evidence may be viewed as heavily weighted toward a finding of such a duty, when deciding a motion for summary judgment the court must view the facts in the light most favorable to the opposite view, that is: in the light most favorable to the non-moving party. *Loyal Order of Moose, Lodge 1392 v. International Fidelity Ins. Co.,* 797 P.2d 622, 628 (Alaska 1990).

Despite this error in the trial court's reasoning, Dr. Deal's motion for summary judgment was properly denied. Whether Dr. Deal is immune from suit under the Good Samaritan statute, AS 09.65.090(a), cannot be determined as a matter of law on the record before us.

AFFIRMED.

MATTHEWS and MOORE, JJ., not participating.