[Civ. No. 52660. Second Dist., Div. Two. May 22, 1979.]

DIXON N. McKENNA, JR., et al., Plaintiffs and Appellants, v.
CEDARS OF LEBANON HOSPITAL, INC., et al.,
Defendants and Respondents.

**COUNSEL**

Malbour L. Watson, Jack Tenner and Marvin Gelfand for Plaintiffs and Appellants.

Home & Clifford, Horvitz, Greines & Poster, Irving H. Greines and Miriam A. Tigerman for Defendants and Respondents.

## OPINION

**BEACH, J.**—Mrs. Evangeline McKenna underwent a therapeutic abortion and tubal ligation at Cedars of Lebanon Hospital on January 17, 1974. That afternoon, she had a seizure and was treated by a resident of the hospital. She stopped breathing and went into a coma from which she never recovered. She died over a week later. Her husband and children sued Dr. Margolin, her physician; Dr. Gilman, the anestheologist; Dr. Warner, the resident who responded to an alert from his beeper; and Cedars of Lebanon Hospital.[1] The jury verdict was 10-2 in favor of the hospital and Dr. Warner and against plaintiffs. Plaintiffs appeal from the judgment. The primary issue here is whether there can be an emergency, as that term is used in the "Good Samaritan" statute within a hospital, so as to invoke that statute's application as a defense to the malpractice action against the doctor and hospital.

### FACTS

Mrs. McKenna entered Cedars of Lebanon Hospital January 16, 1974. Dr. Margolin, her gynecologist, performed a therapeutic abortion and a tubal sterilization on Mrs. McKenna on the morning of January 17, 1974. She was taken to the recovery room at 9:25 a.m. and stated that she had some difficulty breathing. The recovery room records show that later that morning she stated she felt much better and was returned to her room at about 10:45 a.m. She had lunch at 12:30, and the regular diet was "taken well."

At about 2 p.m., Mrs. McKenna started having seizures. The patient sharing the room with Mrs. McKenna called for assistance. The nurse's notes reveal "Unable to get pulse. Dr. Weirner [sic] called stat. . . .." The nurse who originally arrived testified that the patient was "moving her arms and her legs in an uncoordinated, rigid manner which appeared to be some type of seizure activity at that time." Dr. Warner was on the floor above when his beeper sounded. He picked up the phone, spoke to the page operator, and "dashed" to Mrs. McKenna's room. About one minute elapsed from the time he heard his beeper to the time a nurse guided him into Mrs. McKenna's room.

Dr. Warner testified that he observed the patient having a grand-mal type seizure. He observed the patient, asked for Valium from a nurse, and

---

[1] An order of dismissal was subsequently filed as to Dr. Margolin and Dr. Gilman.

slowly gave the patient approximately five milligrams of Valium into the I.V. tubing in order to stop the convulsions.[2] The patient's convulsions stopped; she had a cardiac arrest and complete cessation of breathing. An anestheologist inserted an endotracheal tube; Dr. Warner was giving external cardiac massage, and he called for a Code Blue cardiac pulmonary resuscitation team. The patient was eventually transferred to the intensive care unit where she remained in a coma until her death on January 28, 1974. Appellants claim malpractice by Dr. Warner. As is usual in this type of case, appellants produced a doctor who testified that Dr. Warner's response to the patient's seizure fell below the standard of care and the respondents produced evidence that Dr. Warner's conduct was proper.

CONTENTIONS ON APPEAL:

1. The trial court committed prejudicial error in instructing the jury in terms of the "Good Samaritan law," Business and Professions Code section 2144.

2. Jury misconduct occurred which prevented plaintiffs from receiving a fair trial.

3. The trial judge should have disqualified himself, or at the very least, should have advised plaintiffs prior to the commencement of the trial of his former employment by defendants' insurance carrier.

DISCUSSION:

1.  *The trial court properly instructed the
        jury in terms of Business and Professions Code
        section 2144, the Good Samaritan statute.*

The jury in the case at bench was instructed: "No licensed physician, who in good faith renders emergency care at the scene of the emergency, shall be liable for any civil damages as a result of any of his acts or omissions in rendering the emergency care." The instruction is a paraphrase of a portion of Business and Professions Code section 2144, the so-called Good Samaritan statute. Appellants contend that the policy

---

[2] The syringe contained approximately 10 milligrams of Valium. He squirted out 5 milligrams before injecting into the tubing.

behind the Good Samaritan statute does not apply to hospital emergencies and that the instruction should not have been given. They rely on *Colby* v. *Schwartz*, 78 Cal.App.3d 885 [144 Cal.Rptr. 624], and a comparison of Business and Professions Code section 2144 with other similar statutes.

Business and Professions Code section 2144 applies to "emergency care at the scene of the emergency. . . ." There is no limitation as to the situs of the "scene of the emergency." A 1976 amendment to the statute defined "the scene of the emergency" and included, but did not limit, that phrase to "the emergency rooms of hospitals in the event of a medical disaster." Nothing in the statute itself precludes application of the Good Samaritan statute to emergency situations in hospitals.

Construction of section 2144 was somewhat narrowed in *Colby* v. *Schwartz, supra,* An order dismissing two defendant doctors following the granting of a summary judgment in their favor was reversed by the Court of Appeal. The defendants in *Colby, supra,* were serving on the hospital's emergency call surgical panel. As noted by the court, "defendants in performing the exploratory surgical procedure were practicing within their area of expertise and with all of the benefits of full hospital facilities. It is therefore not unreasonable to hold them to the level of skill and training required under such circumstances. Further, there is no indication in the record that the exigencies of decedent's condition placed any unusual or unforeseen demands on defendants' skills." (78 Cal.App.3d 885, 892.) While dicta in *Colby* may lead to an interpretation that the statute is not applicable to emergency medical treatment in a hospital, the holding of the case does not compel that result.

Dr. Warner in the case at bench was on duty as chief resident the afternoon of the emergency; appellants have failed to demonstrate that he had any legal duty to respond to an emergency call. He was, in essence, a medical volunteer, called to the scene of an emergency from the floor above where he was conducting a routine pelvic examination. Mrs. McKenna was another doctor's patient; there is no showing Dr. Warner had a legal duty to render emergency treatment arising from his contract of employment with Cedars. In such a situation, the legislative intent of encouraging emergency medical care by doctors who have no legal duty to treat a patient is carried out by applying Business and Professions Code section 2144 to Dr. Warner.

Furthermore, the court in *Colby* v. *Schwartz, supra,* 78 Cal.App.3d 885, did not address the contention raised in the case before us that Business and Professions Code section 2144 should be interpreted in light of Business and Professions Code sections 1627.5, 2727.5, and 2861.5.[3] These sections clearly show that the Legislature knows how to restrict the location of emergencies for immunity purposes if it so desires. Section 1627.5 restricts immunity for dentists to those who in good faith render emergency care "at the scene of the emergency occurring outside the place of his practice . . . ." Section 2727.5 provides that registered nurses shall not be civilly liable when they in good faith render "emergency care at the scene of an emergency which occurs outside both the place and the course of her employment . . . ." Section 2861.5 immunizes licensed vocational nurses who in good faith render emergency care "at the scene of an emergency which occurs outside both the place and the course of his employment . . . ."[4] Section 2144 contains no such restrictions concerning the situs of the emergency. Therefore, unless a specific factual situation (such as that in *Colby* v. *Schwartz, supra*) is not within the ambit of the legislative intent in enacting section 2144, the immunity offered by that section should apply regardless of where the emergency occurs.

Appellants additionally rely on the 1976 amendment to section 2144 and on Health and Safety Code section 1317 in arguing that section 2144 does not apply to in-hospital emergencies. The 1976 amendment defines the scene of an emergency as including, but not limited to, the emergency

---

[3] Business and Professions Code section 1627.5 reads as follows: "No person licensed under this chapter, who in good faith renders emergency care at the scene of the emergency occurring outside the place of his practice, or who, upon the request of another person so licensed renders emergency care, to a person for a complication arising from prior care of another person so licensed, shall be liable for any civil damages as a result of any acts or omissions by him in rendering the emergency care."

Business and Professions Code section 2727.5 reads as follows: "A person licensed under this chapter who in good faith renders emergency care at the scene of an emergency which occurs outside both the place and the course of her employment shall not be liable for any civil damages as the result of acts or omissions by such person in rendering the emergency care.

"This section shall not grant immunity from civil damages when the person is grossly negligent."

Business and Professions Code section 2861.5 reads as follows: "A person licensed under this chapter who in good faith renders emergency care at the scene of an emergency which occurs outside both the place and the course of his employment shall not be liable for any civil damages as the result of acts or omissions in rendering the emergency care. This section shall not be construed to grant immunity from civil damages to any person whose conduct in rendering emergency care is grossly negligent."

[4] Section 2861.5 specifically states that it shall not be construed "to grant immunity from civil damage to any person whose conduct in rendering emergency care is grossly negligent."

rooms of hospitals in the event of a medical disaster. Health and Safety Code section 1317 requires that emergency services and care be provided and exempts from civil liability various health facilities, officers, staff, nurses, and employees from acts or omissions done or omitted "while attempting to resuscitate any person who is in immediate danger of loss of life. . . ." We agree with respondents that these sections are "entirely separate statutes designed to achieve distinctly different purposes."

The trial court did not err in instructing the jury in terms of Business and Professions Code section 2144.

At bench plaintiff's cause of action against the hospital was predicated on respondeat superior, not upon whether or not hospital had a proper emergency response system. Dr. Warner was found to be not liable. Thus hospital was properly found not liable. A determination whether a hospital has an adequate emergency-response program for its patients is completely unrelated to the issue whether on a given day a given doctor's response to an emergency in the hospital should be protected under the Good Samaritan statute. Under *Colby* v. *Schwartz* 78 Cal.App.3d 885, 892-893 [144 Cal.Rptr. 624], the answer to the latter issue turns on whether the physician owed a duty to respond; if he did not, then *Colby* teaches that the "need to encourage physicians to render emergency medical care when they otherwise might not" prevails over the policy of vindicating the rights of a malpractice victim.

In the instant case, Dr. Warner proved he was not "on call" for emergencies, was not a member of the hospital team whose job it was to respond to emergencies and did not have a previous physician-patient relationship with Mrs. McKenna. In short, at the time he responded to Mrs. McKenna's emergency, Dr. Warner was truly a volunteer. Since there was evidence showing that Dr. Warner rendered emergency care to Mrs. McKenna in good faith at the place where her emergency occurred, the Good Samaritan statute applied on its face. Under these circumstances, Dr. Warner was entitled to an instruction supporting his Good Samaritan theory of defense.

The fact that Dr. Warner was chief resident physician does not necessarily, or as a matter of law, make him an ex-officio member of an emergency team, which might be expected to deal with emergencies as its normal function, as in *Colby, supra,* We cannot see any justification why Dr. Warner's position as chief resident should deny him the benefit of the emergency doctrine.

2.  ██    *Appellants have failed to show that there*
        *was jury misconduct or that the judgment should be*
        *reversed on the basis of alleged jury misconduct.*

Appellants contend that they were denied the right to an unbiased and unprejudiced jury in that juror DeGuzman "harbored and expressed a belief that physicians should not be sued, and that he did not believe in malpractice suits against physicians." They further contend that another juror, Lena De La Rosa, "was either persuaded by Mr. DeGuzman's remarks or harbored independent similar beliefs." Appellants rely on declarations of four jurors presented in the motion for new trial. The declarations reveal comments by juror DeGuzman that his wife's doctor had somehow mistreated her but that he did not believe in suing the doctor. One juror got the "impression he did not believe in malpractice suits." Another juror was not sure if DeGuzman "was talking about his wife's doctor or all doctors in general." As for juror De La Rosa, one declaration stated that De La Rosa was asked many times "don't you think doctors can do anything wrong?" and never answered the question. "[S]he'd always say that doctors had been through medical school and with their training, knowledge and experience, they should know what they are doing and do the best they can."

Declarations by other jurors were filed in opposition. One stated he had not heard Mr. DeGuzman or any other juror say that it was wrong to sue doctors or that doctors should not be sued by anyone. Juror De La Rosa stated that she never told the other jurors doctors could not or should not be sued for malpractice and has never held that belief. Juror DeGuzman declared that his statement pertained only to his wife's doctor and that he never stated or believed that doctors should not be sued by anyone or that he could never sue a doctor.

"Upon appellate review of an order granting a new trial, 'all intendments are in favor of the action taken by the lower court [and] the affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated.' [Citation.]" (*Weathers* v. *Kaiser Foundation Hospitals,* 5 Cal.3d 98, 106. [95 Cal.Rptr. 516, 485 P.2d 1132].) " 'When an issue is tried on affidavits . . . and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.' [Citations.]" (*Weathers, supra,* 5 Cal.3d at p. 108.)

We can find no abuse of discretion in the case at bench. Various declarations support the view that there were no statements of bias in favor of all doctors and indeed no actual bias by either DeGuzman or De La Rosa. "The determination of a motion for a new trial rests so completely within the trial court's discretion that its decision on the matter will not be disturbed on appeal unless manifest and unmistakable abuse of discretion clearly appears. [Citation.]" (*Rogers* v. *County of Los Angeles,* 39 Cal.App.3d 857, 863 [114 Cal.Rptr. 540].)

3. ■    *The issue of judicial misconduct was not raised below and cannot be raised for the first time on appeal.*

During the fifth day of trial, while hearing argument and ruling on the admissibility of an "incident report," the trial court commented "I used to work for Farmers myself." Farmers, through its division Truck Insurance Exchange, is the insurance carrier for respondents. Appellants do not contend that the trial court judge should have automatically disqualified himself for cause. However, they do contend that they should have "been armed with the information disclosed by the judge on the fifth trial day at the outset of the trial, in order to intelligently exercise the peremptory challenge of a judge as authorized by California Code of Civil Procedure Section 170.6."

Appellants have not demonstrated that this issue was raised below in any way or at any time. Neither do they cite any authority to support their argument. We, therefore decline to review the issue.[5]

The judgment is affirmed.

Fleming, Acting P. J., and Compton, J., concurred.

A petition for a rehearing was denied June 13, 1979, and appellants' petition for a hearing by the Supreme Court was denied August 29, 1979.

---

[5]However, we do note that under the requirements of section 170.6, such a motion must be filed at the time the case is assigned for trial by the master calendar court and cannot be filed later. The trial court judge would hardly be in a position to reveal any prior representation before the case was even assigned to him.