Haile HIRPA, individually and as natural parent and guardian of Duretti Hirpa, Matti Hirpa, and Mitike Haile Hirpa, minors, Plaintiff and Appellant,

v.

IHC HOSPITALS, INC., dba Logan Regional Hospital; Merrill C. Daines, M.D.; F. Neal Mortenson, M.D.; Logan Women's Clinic; and Stephen R. Bienz, M.D., Defendants and Appellees.

State of Utah, Intervenor.

No. 960180.

Supreme Court of Utah.

Nov. 14, 1997.

Patricia W. Christensen, D. Craig Parry, Salt Lake City, and Kathleen Switzer, Bountiful, for the Hirpas.

B. Lloyd Poelman, Salt Lake City, for IHC.

Elliott J. Williams, Kurt M. Frankenburg, Salt Lake City, for Daines.

Jan Graham, Atty. Gen., Salt Lake City, for the State.

HOWE, Justice:

The issues before this court are two questions of state law certified by the United States Court of Appeals for the Tenth Circuit. They are:

(1) Whether physicians employed by a hospital and responding to in-hospital emergency situations are entitled to immunity under Utah Code Ann. § 58–12–23 (1996) (the Good Samaritan Statute); and, if so,

(2) Whether this application of the statute accords with the Utah Constitution.[1]

## FACTS

These questions arise from a series of events culminating in the death of Yeshi Wordoffa. She was admitted to Logan Regional Hospital on June 15, 1989, in active labor prior to the birth of her third child. Shortly after the arrival of her personal obstetrician, Dr. Neal Mortenson, Wordoffa became unresponsive and her hands began to spasm. Mortenson immediately delivered the baby using forceps and then, after finding that Wordoffa had no heartbeat or respiration, called a "Code Blue" that was broadcast over the hospital intercom.

The hospital's medical director, Dr. Merrill C. Daines, a specialist in internal medicine, cardiology, and emergency medicine, heard and responded to the Code Blue. Upon arriving at the delivery room, he was asked to "take over" Wordoffa's care, which he did. He subsequently directed the other members of the response team and made decisions regarding Wordoffa's care. Seventeen minutes after the arrival of the response team, Daines declared Wordoffa dead.

Haile Hirpa, the surviving spouse of Wordoffa, individually and as the natural parent and guardian of Duretti Hirpa, Matti Hirpa, and Mitike Haile Hirpa, Wordoffa's children, filed suit in the United States Court for the District of Utah. Hirpa alleged negligence on the part of five defendants: IHC Hospitals dba Logan Regional Hospital, Daines, Mortenson, the Logan Women's Clinic, which employed Mortenson, and Dr. Stephen R. Bienz, to whom the decedent had been referred by Mortenson early in her pregnancy for treatment of rheumatoid arthritis. Only the claims against IHC and Daines remain.[2]

Early in the case, Daines moved for summary judgment on the ground that he was immune from liability for negligence in his treatment of Wordoffa. He contended that he was acting as a volunteer and was therefore protected by Utah Code Ann. § 58–12–23, Utah's Good Samaritan Act.[3] The State of Utah intervened pursuant to 28 U.S.C. § 2403(b) (1994)[4] to address the constitutionality of the Good Samaritan Act. The State filed a memorandum asserting that the statute should be liberally construed to include emergencies occurring in a hospital setting in order to promote the public policy of encouraging physicians who happen to be in the hospital and are available to provide assistance but that the statute should not be applied to immunize a physician with a

---

1. The questions contained in the certification order were actually phrased in two slightly different ways. On page two, the Tenth Circuit Court of Appeals stated the certified questions as follows:

    (1) Do the provisions of the Utah Good Samaritan Statute, particularly Utah Code Ann. § 58–12–23, apply to grant a licensed physician immunity when that physician provides emergency care at an emergency occurring in a hospital which has employed the responding physician as its medical director?
    (2) If section 58–12–23 does apply in the circumstances appearing here, does the section violate the Utah Constitution?
   However, on page six the questions are phrased as set out in the body of this opinion. We think the version set forth above better characterizes the legal issues to be resolved.

2. Plaintiff stipulated to the dismissal of Bienz and to summary judgment in favor of Mortenson and Logan Women's Clinic.

3. Utah has two primary Good Samaritan laws. Section 58–12–23 covers providers licensed under that chapter and nurses licensed under chapter 31. Section 78–11–22 provides limited immunity to lay volunteers. Throughout this opinion, the term "Good Samaritan Act" refers to section 58–12–23, the statute at issue in this case.

4. Section 2403(b) allows a state to intervene for the presentation of evidence in a suit in federal court "wherein the constitutionality of any statute of that State affecting the public interest is drawn in question." 28 U.S.C.A. § 2403(b) (1994).

preexisting duty to render aid. Thereafter, the trial court denied Daines's motion, ruling that the statute is constitutional and applies in a hospital setting but that "whether ... Dr. Daines had a preexisting duty ... is a legal question [which] turns on [the] totality of the facts."

Following further discovery, Daines renewed his motion for summary judgment, asserting that he had no preexisting duty to Wordoffa as a matter of law. IHC joined Daines's motion, arguing that it could have no vicarious liability for Daines's actions if he was immune from liability. The court then made several additional findings of fact "based upon additional documentation supplied since the last hearing." The court ruled that Daines had no preexisting duty to Wordoffa as a matter of law and was therefore immune from liability under the Good Samaritan Act and that IHC could not be liable on a respondeat superior theory or otherwise.

Plaintiff appealed from the trial court's grant of summary judgment to the United States Court of Appeals for the Tenth Circuit. After reviewing the issues presented, that court concluded that (1) the Good Samaritan Act is silent as to whether it applies to emergencies occurring in hospital settings; (2) there are no Utah appellate decisions construing the statute; and (3) other state court decisions construing statutes that are silent as to whether they apply in a hospital setting reach inconsistent results. The Tenth Circuit certified the questions recited above regarding the interpretation of section 58–12–23 and the Utah Constitution to this court, as it appears that our interpretations may be dispositive in this case.[5]

## ANALYSIS

■ The first question we must answer is whether physicians employed by a hospital and responding to in-hospital emergencies are entitled to immunity under section 58–12–23. On the basis of the following analysis, we conclude that doctors are protected by the Good Samaritan Act when they respond to an in-hospital emergency, *if they have no preexisting duty to do so.*

Plaintiff contends against this result on three primary bases. First, the plain language of the statute is ambiguous and, therefore, we should incorporate the definition of emergency found in Utah Code Ann. § 78–11–22 (1996)[6] into section 58–12–23. Plaintiff argues that section 78–11–22's definition of emergency would not cover a doctor responding to an emergency in a hospital that employs him. Second, the legislative history of the Good Samaritan Act and subsequent legislative enactments demonstrate that the legislative intent was that the statute not apply in such situations. Third, such an interpretation contravenes the purpose of the act and public policy considerations.

Utah's Good Samaritan Act, covering licensed medical providers, states:

> No person licensed under this chapter ... who in good faith renders emergency care at the scene of the emergency, shall be liable for any civil damages as a result of any acts or omissions by such person in rendering the emergency care.

Utah Code Ann. § 58–12–23 (1996). Plaintiff contends that the term "emergency" in the phrase "emergency care at the scene of an emergency" is unclear and that therefore no "plain meaning" exists. On this basis, plaintiff argues that the statutory definition of emergency contained in section 78–11–22, a Good Samaritan act for lay persons, should be incorporated into the provisions of section 58–12–23. We find this argument to be without merit.

First, the term "emergency" is not unclear or ambiguous. "Emergency" is defined as an "unexpected situation or occurrence that demands immediate attention." *American Heritage Dictionary* 232 (2d Coll. ed.1983). This definition, synonymous with the common understanding of the term, gives courts adequate guidance to decide which factual

---

5. The appeal in the Tenth Circuit has been stayed pending our ruling.

6. Section 78–11–22, enacted in 1983, twenty-two years after the enactment of section 58–12–23, provides limited immunity to a lay person "who renders emergency care at or near the scene of, or during an emergency, gratuitously and in good faith."

scenarios qualify as emergencies and therefore fall within the coverage of the statute. *See Anderson v. Little & Davenport Funeral Home, Inc.*, 242 Ga. 751, 251 S.E.2d 250, 252 (1978) (finding that "emergency care" ordinarily signifies the performance of necessary personal services during unforeseen circumstance that calls for immediate action).

Second, even if the term "emergency" in section 58–12–23 were unclear and section 78–11–22's definition of emergency were incorporated into the statute, we believe that section 78–11–22's definition of emergency includes the facts presented by this case. That section defines "emergency" as "an unexpected occurrence involving injury, threat of injury, or illness to a person or the public, including motor vehicle accidents, disasters, actual or threatened discharges, removal, or disposal of hazardous materials, and other accidents or events of a similar nature." Plaintiff contends that "clearly, an emergency arising at a hospital during a medical procedure is not an emergency event similar in nature to motor vehicle accidents, disasters or discharges of hazardous materials." However, plaintiff focuses on the terms "motor vehicle accidents, disasters," and "discharges of hazardous materials," forgetting that these are merely examples of situations "includ[ed]" within the broader definition of emergency. The facts of this case would appear to fall within the broader definition of "an unexpected occurrence involving injury . . . or illness." Thus, even if we believed it necessary to incorporate section 78–11–22's definition, it is broad enough that it would not significantly alter the dictionary definition of emergency adopted above.

■ In light of our conclusion that the plain meaning of section 58–12–23 is clear and unambiguous, we need not address at length plaintiff's contention that the legislative history of section 58–12–23 supports a narrow reading of "emergency." "Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations." *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253, 259 (Utah 1994).

■ Finally, plaintiff maintains that the background of Good Samaritan acts and public policy considerations support exclusion of emergency care provided by physicians at emergencies arising in a hospital setting. We disagree. Applying the Utah Good Samaritan Act in this case actually furthers the purpose and intent of the legislation. As frequently recognized, "the primary purpose of [Good Samaritan] statutes is to encourage prompt emergency care by granting immunity from civil damages and removing the fear of liability." Danny R. Veilleux, Annotation, *Construction and Application of "Good Samaritan" Statutes*, 68 A.L.R.4th 294, 300 (1989); *see, e.g., Colby v. Schwartz*, 78 Cal. App.3d 885, 144 Cal.Rptr. 624, 626–27 (1978).

> At common law, there is no affirmative duty to rescue. . . . However, the common law recognizes that once a person chooses to rescue another, he is held to a duty of due care. The result of the common law rules is that the Good Samaritan who tries to help may find himself mulcted in damages, while the priest and the Levite who pass by on the other side go on their cheerful way rejoicing.

*Flynn v. United States*, 681 F.Supp. 1500, 1506 (D.Utah 1988), *modified in part*, 902 F.2d 1524 (10th Cir.1990). Good Samaritan laws responded to the common law rule that made one liable for negligently rendering voluntary emergency assistance by extending immunity from suit, thereby encouraging humanitarian acts by licensed medical providers.

Applying the Utah Act in a hospital setting furthers this purpose, as the State of Utah argues in this case and as many other courts have determined. *See McKenna v. Cedars of Lebanon Hosp., Inc.*, 93 Cal.App.3d 282, 155 Cal.Rptr. 631, 634 (1979) (holding that Good Samaritan Statute applies regardless of where emergency takes place); *Burciaga v. St. John's Hosp.*, 187 Cal.App.3d 710, 232 Cal.Rptr. 75, 78 (1986) (applying Good Samaritan law to emergencies both within and without hospital). It does so by encouraging licensed providers, whose training and expertise may be beneficial in preserving human life but who have no duty to aid, to respond to emergencies whenever and wherever they

arise. A patient in a hospital may need emergency care from a volunteer provider as much as any other emergency victim. In addition, it seems arbitrary to subject a volunteer provider who responds to an emergency, although not obligated to do so, to liability merely because his volunteer acts occurred in a hospital. Thus, we hold that section 58–12–23 applies without regard to location.

Of course, our reasoning necessarily compels the result that section 58–12–23 does not apply in a situation involving a preexisting duty to render aid. In that case, no additional encouragement to the provider is needed because he already has a duty to respond to the emergency situation. The purpose of encouraging volunteerism would not be furthered as the responding provider could not be considered a volunteer. Rather, he would be compelled by a legal duty to act.

> If the doctor had a particular employment duty to aid the patient at the hospital ... then he had a duty to the patient to begin with; and in such a case he does not need a special inducement to offer aid, the aid he offers is not "voluntary" in the sense of a Good Samaritan, and public policy would be ill-served if he were relieved of the usual physician's duty of care and given immunity in such a case.

*Henry v. Barfield*, 186 Ga.App. 423, 367 S.E.2d 289, 290 (1988); *see also Clayton v. Kelly*, 183 Ga.App. 45, 357 S.E.2d 865, 868 (1987) ("[C]learly the occurrence of an 'emergency' will not invoke the immunity, if it was the doctor's duty to respond to the emergency."). Courts in other states "have uniformly held that the law is not meant to exempt all medical personnel in every emergency situation, but only those personnel who happen across an emergency outside the normal course of their work and *who otherwise have no duty to assist.*" *James v. Rowe*, 674 F.Supp. 332, 333–34 (D.Kan.1987) (emphasis added); *see Colby*, 144 Cal.Rptr. at 628; *Clayton*, 357 S.E.2d at 868, 68 A.L.R.4th at 317 (collecting numerous cases holding same). Thus, a court's primary inquiry in deciding whether to apply the Utah Act to a given set of facts should be whether there was a preexisting duty to render aid. If a preexisting duty is found, whatever its source, the act cannot apply to immunize the provider.

■ Such a duty may arise in a variety of ways. Courts or juries deciding whether a duty existed in a particular case may consider whether the doctor was "on call" or otherwise contractually obligated to respond, whether hospital rules required that the doctor respond, whether a doctor/patient relationship existed, whether employment by the hospital created a duty, or whether a duty was created by the practice or custom of the doctor responding to similar emergencies. *See Praet v. Sayreville*, 218 N.J.Super. 218, 527 A.2d 486, 489 (A.D.1987) (noting that common-law rule that bystander had no independent duty to rescue person in peril had no relevance whatsoever to one who had either contractual, relational, or transactional duty to render assistance and that one having such duty was not entitled to immunity designed only to encourage action by one who has no preexisting legal duty to act); *McKenna*, 155 Cal.Rptr. at 635; *Clayton*, 357 S.E.2d at 867–68. If Daines had no duty to act under any of these theories, then section 58–12–23 was properly applied.

Several other courts have reached similar results. Although plaintiff primarily relies on *Colby v. Schwartz*, 78 Cal.App.3d 885, 144 Cal.Rptr. 624 (1978), as support for its interpretation of the Good Samaritan Act, we believe *Colby* and its progeny support our interpretation. In *Colby*, the California Court of Appeals refused to apply the California Good Samaritan law to members of a hospital's emergency call panel because they operated on the decedent "as part of their normal course of practice." *Id.*, 144 Cal. Rptr. at 627. The court went on to state:

> Typically, it was the roadside accident victim who, as a result of the strictures of the common law malpractice doctrines, was left uncared for. However, hospital patients such as the decedent have historically enjoyed the benefits of full medical attention. There is no need for special legislation to encourage physicians to treat this class of individuals.... [P]hysicians, like defendants, who treat patients requiring immediate medical care as part of

their normal course of practice do not need the added inducement that immunity from civil liability would provide.... [The Act was] directed towards physicians who, by chance and on an irregular basis, come upon or are called to render emergency medical care.... The enactment of Good Samaritan legislation represents the resolution of competing interests. On the one hand, there is an interest in the vindication of the rights of the malpractice victim. On the other hand, there is the need to encourage physicians to render emergency medical care when they otherwise might not. ... [When] physicians are rendering such aid as part of their normal course of practice, we hold the balance of interest must favor the redress of malpractice rights.

*Id.* at 628–29. Although the court mentioned "roadside accident victims" and seemed to generally exclude all hospital care from the purview of the act if not rendered "by chance and on an irregular basis," the court also analyzed whether the physicians already had a duty to treat the victim. It thereafter refused to apply the Good Samaritan Act in a situation where there was a preexisting duty.

Despite *Colby's* lack of clarity, its progeny demonstrate that determining whether a duty exists is indeed the critical inquiry for a court and that the California Good Samaritan Act applies to emergency care rendered in a hospital. In a case remarkably similar to the one before us, *McKenna,* 93 Cal.App.3d 282, 155 Cal.Rptr. 631, a woman entered the hospital for a procedure by her gynecologist. When she began having seizures, the chief resident was called to the patient's room from the floor above. After the chief resident administered Valium to her, she went into cardiac arrest and died. The plaintiffs filed suit, claiming malpractice, and the defendant asserted the Good Samaritan Act as a defense. The court of appeals first noted that the statute contained no location limitation. It then acknowledged that *Colby* had "narrowed" the construction of the act but stated that although "dicta in *Colby* may lead to an interpretation that the statute is not applicable to emergency medical treatment in a hospital, the holding of the case does not compel that result." *Id.,* 155 Cal.Rptr. at

633. The court proceeded to uphold the trial court's dismissal of the action on the basis that the Good Samaritan Act applied. The court stated that the plaintiffs

failed to demonstrate that [the doctor] had any legal duty to respond to an emergency call. [The doctor] was, in essence, a medical volunteer, called to the scene of an emergency from the floor above.... In such a situation, the legislative intent of encouraging emergency medical care by doctors who have no legal duty to treat a patient is carried out by applying [the Good Samaritan Act].

*Id.* at 633. The court ruled that unless a specific factual situation like *Colby* was not within the ambit of the legislative intent of the Good Samaritan Act, "the immunity offered by the [Act] should apply regardless of where the emergency occurs." *Id.,* 155 Cal. Rptr. at 634.

A second case relied upon by plaintiff, *Guerrero v. Copper Queen Hospital,* 112 Ariz. 104, 537 P.2d 1329 (1975), also supports our holding. The plaintiffs in that case sought recovery from Copper Queen Hospital because the hospital denied their children emergency room treatment for their burns, apparently because they were nonresident aliens. The court held that "a hospital may not deny emergency care to any patient without cause." *Id.,* 537 P.2d at 1331. In defense, the hospital claimed that it was entitled to the protection of the Arizona Good Samaritan law, which immunizes volunteer emergency care providers unless they are guilty of gross negligence. In rejecting this defense, the court stated:

The apparent purpose of this statute is to relieve the burden of liability on individuals *who choose to or not to render aid to others in emergency situations.* ... The medical expertise of a hospital staff is assumed. The statute is not applicable to emergency medical treatment in a hospital.

*Id.* at 1331 (emphasis added). Although the court's final statement regarding the inapplicability of the Good Samaritan law in a hospital setting is very broad, its conclusion was based on its earlier determination that a hospital has a preexisting duty to provide

emergency care to all patients who present themselves. That is the same result that would be reached under our reasoning today. If a duty to treat exists, section 58–12–23 does not apply. Moreover, even if *Guerrero* stands for the broad proposition that the Arizona Good Samaritan law can never apply in a hospital, we simply disagree with this nonbinding authority. We think that the purpose of the Utah statute is furthered by applying it to any emergency situation where the responding medical provider had no preexisting legal duty to respond, even if that location is a hospital.

The second question we must address is whether our interpretation of section 58–12–23 accords with the open courts and wrongful death provisions of the Utah Constitution. We conclude that it does.

### A. Open Courts Provision

Hirpa first argues that section 58–12–23 violates article I, section 11 of the Utah Constitution, the open courts provision. That section provides:

All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this state, by himself or counsel, any civil cause to which he is a party.

■ This provision, as we have interpreted it, imposes a substantive limitation on the legislature's ability to eliminate or unduly restrict causes of action seeking relief for injury to "person, property, or reputation." *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 676 (Utah 1985).

■ Despite the importance of this function, the rights of individuals protected by the open courts provision must be balanced against the legislature's need to enact laws to meet changing societal needs. Thus, the rights protected by the open courts provision are "not always paramount," *id.* at 677, and

"the Legislature has great latitude in defining, changing, and modernizing the law, and in doing so may create new rules of law and abrogate old ones." *Id.* at 676. This is so because "[i]t is, in fact, one of the important functions of the Legislature to change and modify the law that governs relations between individuals as society evolves and conditions require." *Id.* Thus, we will declare a statute violative of the open courts provision only if it "is unreasonable and arbitrary and will not further the statutory objectives." *Id.* at 681.

■ To achieve the proper balance between the competing interests of allowing the legislature to address changing societal problems and protecting injured persons, a two-step process is employed to determine whether a statute abrogating a cause of action or remedy violates the open courts provision:

First, section 11 is satisfied if the law provides an injured person an effective and reasonable alternative remedy "by due course of law" for vindication of his constitutional interest.... Second, if there is no substitute or alternative remedy provided, abrogation of the remedy or cause of action may be justified only if there is a clear social or economic evil to be eliminated and the elimination of an existing legal remedy is not an arbitrary or unreasonable means for achieving the objective.

*Id.* at 680 (citations omitted).

■ We have determined that section 58–12–23 bars Wordoffa's husband and children's wrongful death cause of action against Daines, as long as he had no preexisting duty to act. No alternative cause of action has been created.[7] However, we are not persuaded that Yeshi Wordoffa's family would have had a cause of action against Daines prior to the enactment of section 58–12–23. This is so because this court has been loath to adopt the common law rule that a Good Samaritan could be sued for negligence.

---

7. Daines briefly argued that an institutional duty might exist on the part of the hospital which would provide an alternative remedy because the

hospital could then be sued even if the doctor could not.

Utah adopted the common law by statute in 1898, with several caveats. Specifically, the statute provides:

> The common law of England so far as it was not repugnant to, or in conflict with, the constitution or laws of the United States, or the constitution or laws of this state, and so far only as it is consistent with and adapted to the natural and physical conditions of this state and the necessities of the people hereof, is hereby adopted, and shall be the rule of decision in all courts of this state.

Utah Code Ann. § 68-3-1 (1996).

It is unclear, given the early rural and undeveloped nature of this state and the accompanying need for volunteer assistance from one's neighbors and others, whether the common law rule allowing suits against volunteers would have been found to be "consistent with and adapted to the natural and physical conditions of the state and the necessities of the people." Moreover, case law from this court indicates that the common law rule was not consistent with Utah needs and policies and persuades us that a volunteer's negligence would have been immunized even before the passage of section 58-12-23. In *Covert v. Kennecott Copper Corp.*, 23 Utah 2d 252, 461 P.2d 466 (1969), we addressed a claim for emotional distress brought against the plaintiff's deceased husband's employer. The husband was the victim of a mine cave-in that trapped him inside the feeder compartment of an ore crushing machine. Attempts to dig him out were futile. The volunteer co-workers attempting to extricate him decided that the best hope to save him was to pass him through the machine to the other side. The machine was activated, but the attempt proved unsuccessful and the body was mutilated in the process. The plaintiff sought recovery for the emotional distress caused by this mutilation.

In denying the plaintiff's claim, we affirmed the social policy that volunteerism should be encouraged by affording immunity to Good Samaritans. We stated:

> [I]t is and should be the policy of the law not to discourage persons under such circumstances as existed here from undertaking a rescue by compelling them to "walk on eggs" for fear that some mishap or misjudgment might result in their being held liable in damages; but on the contrary, should be somewhat liberal in affording reasonable protection to persons who attempt to carry out humanitarian impulses in attempting to save a life.

*Id.* at 255, 461 P.2d 466 (footnote omitted). This court thereby created immunity for emergency action and repudiated the harsh common law rule that allowed volunteers to be sued for negligence. Therefore, it appears that no action could be maintained against volunteers even before the passage of 58-12-23. There is no reason to think that this immunity would not also have been extended to medical providers who gratuitously rendered assistance. Thus, Daines, if truly a volunteer, would very likely have been immune from suit even without the statutory protection afforded by 58-12-23. Under these circumstances, the open courts provision cannot be offended because no cause of action has been abrogated by the passage of section 58-12-23.

We believe that section 58-12-23 also passes the second step of *Berry*'s two-step analysis. As previously stated, section 58-12-23 encourages licensed medical providers to render potentially life-saving medical care in the wake of an emergency. The Good Samaritan Act provides incentives for licensed medical providers to render aid by making them immune from suit, even if their good faith attempt is carried out in a negligent manner.[8]

> The limited protection afforded to physicians by the common law did not sufficiently allay their fears of legal action, and thus the common law worked as a serious deterrent to the rendition of needed medical aid in emergency situations.

*Colby*, 144 Cal.Rptr. at 627. Receiving physician-rendered medical care can significantly increase the likelihood of surviving a life-

---

8. Because this case does not raise any claims of gross negligence or willful, wanton, or intentional misconduct, we need not address whether the Act would be constitutional if applied to immunize a physician who acted with one of those levels of culpability.

threatening situation. Therefore, it must be considered a social evil that the common law actually contained disincentives to licensed medical providers who were potentially able to respond to an emergency and render medical care. The legislature remedied this situation by immunizing licensed medical providers who sought in good faith to aid others by rendering emergency medical care.

The manner in which the legislature sought to accomplish this goal is significant. Although the act provides immunity to doctors who negligently provide emergency medical care, thereby eliminating a potential suit against the provider, its provisions are narrowly tailored. For example, only good faith providers are immunized. It also appears from the act's language that the immunity applies only to doctors rendering emergency care. Thus, care offered after the emergency has ended is not immunized. Finally, as we have interpreted the act, it applies only to medical doctors who had no preexisting duty to render aid. Thus, the act immunizes only true volunteers who render aid even though they are not obligated to do so. We think these limitations indicate the reasonableness of the act. The statute does not cut an unnecessarily wide swath through causes of action against medical providers. Rather, immunity is provided under limited circumstances and only for the purpose of encouraging potentially life-saving emergency medical care. Therefore, we think the act is a reasonable attempt to eliminate a clear social evil and does not violate article I, section 11 of the Utah Constitution.

### B. The Wrongful Death Provision

■ Plaintiffs also argue that section 58–12–23 violates Utah Constitution article XVI, section 5, the wrongful death provision, which states:

The right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation

for injuries resulting in death is provided for by law.

"The plain meaning of the constitutional provision ... is to prevent the abolition of the right of action for a wrongful death, 'whether in a wholesale or piecemeal fashion.'" *Berry*, 717 P.2d at 684 (quoting *Malan v. Lewis*, 693 P.2d 661, 667 (Utah 1984)). Thus, the legislature may not repeal the wrongful death statute; neither may it nullify the wrongful death action by indirect means. However, "the Legislature may enact reasonable procedures for the enforcement of wrongful death actions and may provide for reasonable defenses that are not inconsistent with the fundamental nature of the wrongful death action itself." *Berry*, 717 P.2d at 685.

Utah law is clear that a plaintiff in a wrongful death action is subject to defenses which could have been asserted against the decedent had he lived and prosecuted the suit. *Kelson v. Salt Lake County*, 784 P.2d 1152, 1155 (Utah 1989). The Good Samaritan Act is intended to induce licensed medical providers to voluntarily render emergency medical aid by eliminating their liability. The Act provides that a defense can be asserted against a malpractice claim by a living plaintiff. That same defense should be allowable in a wrongful death action by the deceased patient's heirs. In view of this, we think the Good Samaritan Act to be a reasonable defense, not inconsistent with the fundamental nature of the wrongful death action nor an abrogation of the wrongful death action itself. Therefore, it does not violate article XVI, section 5.[9]

### CONCLUSION

The responses to the questions certified by the Tenth Circuit Court of Appeals are as follows:

(1) Utah Code Ann. § 58–12–23 affords immunity to a physician rendering emergency medical care at the scene of an emergency occurring in a hospital, if the physician is under no preexisting duty to do so.

---

**9.** Once again we note that our holding is limited to the facts of this case in which only negligence

was alleged.

(2) When interpreted in this manner, section 58–12–23 does not violate either article I, section 11 or article XVI, section 5 of the Utah Constitution.

ZIMMERMAN, C.J., STEWART, Associate C.J., and RUSSON, J., and JAMES L. SHUMATE, District Judge, concur.

Having disqualified herself, DURHAM, J., does not participate herein; JAMES L. SHUMATE, District Judge, sat.