*This opinion is subject to revision before final
publication in the Pacific Reporter*

**2021 UT 4**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

LEONID FELDMAN, personally and as personal representative
of the estate of LIUDMILA FELDMAN; MARINA DONNELLY;
and ANTON KHOKHLOV
*Appellants*,

*v.*

SALT LAKE CITY CORPORATION, SALT LAKE CITY
*Appellee*.

No. 20190238-SC
Heard September 9, 2020
Filed January 28, 2021

On Direct Appeal

Third District, Salt Lake County
The Honorable Robert P. Faust
No. 180901840

Attorneys:

Eric S. Olson, Lena Daggs, Salt Lake City, for appellants

Samantha J. Slark, Salt Lake City, for appellee

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE PEARCE, and JUSTICE PETERSEN joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶1 Liudmila Feldman tragically drowned in a creek at a Salt Lake City Corporation (City) park. Her husband and adult children (the Feldmans) brought a wrongful death suit against the City. Asserting protection under Utah's Limitations on Landowner Liability Act (Act), the City moved to dismiss. The district court granted the motion. It found the Feldmans' wrongful death action

was barred by the Act's prohibition on claims for personal injury caused by the inherent risks of participating in an activity with a recreational purpose. The Feldmans appeal, arguing: (1) the Act does not bar wrongful death claims; (2) if it does, it violates the Utah Constitution; and (3) their complaint sufficiently alleges that Ms. Feldman did not drown due to an inherent risk of entering the creek. We disagree with the Feldmans on the first two issues but reverse the district court on the third and remand for further proceedings consistent with our opinion.

## BACKGROUND

¶2    The City owns Parley's Historic Nature Park (Park) and the East Creek Access area within the Park.[1] On April 23, 2017, Ms. Feldman and her husband, Leonid Feldman, went walking with their dogs in the Park. The dogs went into the creek at the East Creek Access. Leonid entered the creek to retrieve the dogs but was "pushed downstream" and unable to retrieve them. Ms. Feldman then tried to get the dogs out. She entered the creek but "was caught in [the] dangerous current." Unfortunately, all efforts to rescue her from the current failed, and she died.

¶3    The Feldmans sued the City for negligence, premises liability, negligent infliction of emotional distress, vicarious liability, and wrongful death.[2] Central to these claims is the

---

[1] "When reviewing a rule 12(b)(6) motion to dismiss, we accept the factual allegations in the complaint as true and interpret those facts, and all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff as the nonmoving party." *Olguin v. Anderton* 2019 UT 73, ¶ 4, n.3 (citation omitted). Any quoted, uncited text in this section is as stated in the Feldmans' complaint.

[2] The Feldmans brought their claims both personally and as representatives of Ms. Feldman's estate. They refer to their claims collectively as "wrongful death claims." For the purpose of our analysis, it matters not which of their claims are brought personally by the Feldmans or on behalf of Ms. Feldman's estate, which claims are brought under Utah's wrongful death statute, or which claims are brought to prove Ms. Feldman's estate's underlying personal injury claim. As such, and for readability, we adopt the Feldmans' preferred nomenclature of "wrongful death claims" (or claims) to refer to their asserted causes of action.

The Feldmans also named as defendants BIO-WEST, Inc. and Forsgren Associates, Inc., whom the Feldmans initially believed were involved in the development of the East Creek Access area.

(continued . . .)

Feldmans' allegation that "[t]he dangerous current at the creek . . . resulted from manmade developments at the East Creek Access."

¶4    In response, the City moved to dismiss the complaint under rule 12(b)(6) of the Utah Rules of Civil Procedure, asserting protection under section 401 of the Act, UTAH CODE § 57-14-101–501. That section prohibits a person from making "a claim against or recover[ing] from an owner of any land . . . opened to the general public without charge . . . for personal injury or property damage caused by the inherent risks of participating in an activity with a recreational purpose on the land." UTAH CODE § 57-14-401(1) (2018) (amended 2019).[3] The City argued that section 401 applied because: (1) the Feldmans' complaint alleged that the City owned the East Creek Access; (2) the East Creek Access was open to the public without charge; (3) Ms. Feldman had been participating in an activity with a recreational purpose and entered the creek in furtherance of that activity; and (4) "[b]eing caught in a strong or dangerous current is an inherent risk of entering any creek, stream, river, or body of water."

¶5    The Feldmans countered the City's motion to dismiss with three main arguments. First, they asserted that section 401 of the Act did not apply because (1) the Feldmans "do not fall into the statute's definition of 'a person'"; (2) their wrongful death claims were not claims for "personal injury or property damages" under the statute; and (3) Ms. Feldman "was not killed by an 'inherent risk' of entering a creek." Second, they argued that if section 401 barred their wrongful death claims, the statute would violate article XVI, section 5 of the Utah Constitution (Wrongful Death Clause). Third, they argued that if section 401 does apply, it should be read to contain an exception for "any conduct that is willful or wanton" under Utah Code § 57-14-204.

¶6    The Feldmans also moved to amend their complaint, seeking to add the allegation that the City's "conduct was willful or malicious, in that [it] acted and failed to act even though [it] knew of the hazard and knew that serious injury was a probable result of

---

Upon a finding that these entities had no significant involvement in such development, they were dismissed from the suit.

[3] Section 401 was amended in 2019 and now bars claims "for personal injury or property damage caused either directly or indirectly by participating in an activity with a recreational purpose on the land." UTAH CODE § 57-14-401(1).

contact with the hazard." The City opposed the motion to amend as futile, arguing, *inter alia*, that section 401 contains no exception for willful or malicious conduct and the allegations were not supported by facts in the complaint.

¶7 The district court granted the City's motion to dismiss, holding that section 401 barred the Feldmans' claims. The district court first found that the Feldmans are "person[s]" within the meaning of the Act. It then held that section 401 barred the Feldmans' wrongful death claims because "'personal injury' claims include[] all personal torts" and so the statute "precludes all tort claims, including the personal tort of wrongful death." Next, the district court held that "a strong current, whether . . . caused by spring run-off, high rain, a manmade improvement, or all of the above, is a danger that is common to a creek or any body of water," and, thus, "a current is an inherent risk of entering a creek."

¶8 The district court went on to reject the Feldmans' argument that the application of the statute violated the Wrongful Death Clause because, at the time the Utah Constitution was adopted in 1895, there was no express authority for wrongful death suits against the State.

¶9 The district court also held that the proposed amendment to the complaint did nothing to defeat the City's motion to dismiss, reasoning that the Feldmans "provide[d] no facts to support their claims" and the proposed amendments were futile since section 401 has no "statement that a landowner is liable for a willful or malicious failure to guard or warn." The district court thus granted the City's motion to dismiss.

¶10 The Feldmans appealed. We have jurisdiction under Utah Code section 78A-3-102(3)(j).

## STANDARD OF REVIEW

¶11 "We review a decision granting a motion to dismiss for correctness, granting no deference to the decision of the district court." *Amundsen v. Univ. of Utah*, 2019 UT 49, ¶ 20, 448 P.3d 1224 (citation omitted). "In so doing, we accept the plaintiff's description of the facts alleged in the complaint to be true and view all reasonable inferences from those facts in the light most favorable to the plaintiff." *Id.* (citation omitted) (internal quotation marks omitted).

¶12 Regarding the underlying claims, we review the district court's interpretation of a statute for correctness—it being a question of law. *Bryner v. Cardon Outreach, LLC*, 2018 UT 52, ¶ 7, 428 P.3d 1096. Similarly, we review the district court's determination of

the constitutionality of a statute for correctness. *See State v. Drej*, 2010 UT 35, ¶ 9, 233 P.3d 476.

## ANALYSIS

¶13   The Feldmans argue that the district court erred in granting the City's rule 12(b)(6) motion to dismiss. Specifically, they argue that the district court erred because: (1) section 401 does not bar wrongful death actions; (2) if it does, it violates the Wrongful Death Clause of the Utah Constitution; and (3) even if the statute could apply here, it does not bar the Feldmans' claims because Ms. Feldman's death was not caused by a risk inherent in her usage of the park.[4]

¶14   We address each of these arguments below and conclude the following: First, because section 401 may provide a defense that goes to the viability of Ms. Feldman's underlying personal injury claims, it also may bar the Feldmans' wrongful death claims. Second, section 401 does not violate the Utah Constitution because it merely provides a reasonable defense to wrongful death claims. Third, the Feldmans have sufficiently alleged that Ms. Feldman's death was not caused by an inherent risk of recreating in the Park,

---

[4] In a footnote, the Feldmans make one additional argument in the alternative. Section 201 of the Act generally provides that a landowner owes no duty of care to warn a recreational user of any dangerous conditions on the land. UTAH CODE § 57-14-201 (2018). However, it contains an exception for a landowner's willful or malicious failure to guard or warn against a dangerous condition, as described in section 204. *See id.* § 57-14-204.

The Feldmans argue that "[i]f the applicability of Section 57-14-201 is raised as a separate basis for affirming the district court's decision," we should reverse the district court's denial of their motion to amend their complaint. We take this to mean that the Feldmans consider section 204's exception for a willful or malicious failure to guard or warn against a dangerous condition to be a separate basis for affirmance. But this separate basis is not raised, and we nevertheless agree with the district court that the Feldmans' motion to amend was "futile as section 401 contains no statement that a landowner is liable for a willful or malicious failure to guard or warn." And because section 204 does not apply, we need not address the Feldmans' argument that the district court misapplied the "open and obvious danger" common-law exception to willful or malicious conduct.

and so the district court erred in granting the City's motion to dismiss.

## I. SECTION 401 MAY APPLY TO WRONGFUL DEATH CLAIMS

¶15   The Feldmans assert a wrongful death action against the City. The City, in turn, asserts a defense under section 401 of the Act. UTAH CODE § 57-14-401 (2018). Section 401 bars "claim[s] . . . for personal injury" against landowners in certain circumstances. If Ms. Feldman had lived to maintain her own action against the City, her claim undoubtedly would have been a claim "for personal injury" under the statute. Assuming the other elements of section 401 were satisfied, it would bar such a claim. The question is whether the statute also, by extension, bars her family's wrongful death claims arising from the same injury. We hold that, if the Act is otherwise applicable, it does.

¶16   To show why, we first discuss the unique nature of a wrongful death action in Utah. Next, we show that Utah courts allow defendants in a wrongful death suit to assert some, but not all, of the defenses that could have been asserted against the decedent's underlying personal injury claim. Finally, we hold that section 401 provides a defense that may be asserted against the Feldmans' wrongful death claims.

### A. In Utah, Wrongful Death "Occupies a Position of Privilege Among Torts"

¶17   When considering defenses asserted in wrongful death actions, this court often has begun by explaining the historical and unique nature of the action. *See, e.g., Riggs v. Ga.-Pac. LLC*, 2015 UT 17, ¶ 12, 345 P.3d 1219; *Bybee v. Abdulla*, 2008 UT 35, ¶ 18, 189 P.3d 40. For context, we briefly do so again here. In early English common law, courts for centuries considered the accidental killing of another person a compensable harm. *See Riggs*, 2015 UT 17, ¶ 12. However, in 1808, an English court surprisingly ruled that death was not an "injury." *Id.* (citation omitted). In response, in 1846, England adopted Lord Campbell's Act, which provided relatives of a decedent the right to recover for their associated losses. *Id.; see also Jones v. Carvell*, 641 P.2d 105, 107 (Utah 1982). In the ensuing decades, many American states followed suit, enacting some form of wrongful death statute; however, the states' treatments of the action varied regarding the scope of recovery and its degree of independence from the underlying personal injury. *See Riggs*, 2015 UT 17, ¶ 12; *Bybee*, 2008 UT 35, ¶ 18; *Carvell*, 641 P.2d at 107; *Webb v. Denver & R.G.W. Ry. Co.*, 24 P. 616, 617 (Utah Terr. 1890). Utah first enacted its wrongful death statute in 1874 and, to presumably eliminate any uncertainty about the long-term viability of the cause

of action, enshrined it in the Utah Constitution in 1895. *Bybee*, 2008 UT 35, ¶ 18 (citing UTAH CONST. art. XVI, § 5). Because of its constitutional protection, "wrongful death occupies a position of privilege among torts." *Id.*

¶18 Today's wrongful death statute provides that "when the death of a person is caused by the wrongful act or neglect of another, his heirs . . . may maintain an action for damages against the person causing the death." UTAH CODE § 78B-3-106(1).

¶19 The Feldmans argue that because a wrongful death claim has its own statutory basis, it is "different and separate from a personal injury claim." It is true that the wrongful death statute "grants a person's heirs the right to maintain an action for damages," and there is "nothing in the statute to suggest that the cause of action is tied to the decedent's underlying personal injury claim." *Riggs*, 2015 UT 17, ¶ 11 (citation omitted) (internal quotation marks omitted). It is also true that the two types of claims seek to compensate different types of losses. "A wrongful death action compensates heirs for their personal losses"—typically non-economic losses such as "loss of society, love, companionship, protection and affection." *Id.* ¶ 16 (citation omitted). In contrast, a "personal injury action is aimed more directly at compensating an individual for losses" such as "lost wages, medical expenses and other personal economic consequences of an injury." *Id.*

¶20 Still, we cannot ignore the inescapable fact that but for Ms. Feldman's personal injury (drowning), there would be no wrongful death claim. Therefore, this court has consistently held that while wrongful death "is a separate claim that comes into existence upon the death of the injured person," it is "derivative in the sense that it will not lie without a viable underlying personal injury claim." *Bybee*, 2008 UT 35, ¶ 23 (citing *Meads v. Dibblee*, 10 Utah 2d 229, 350 P.2d 853, 855 (1960); *Halling v. Indus. Comm'n*, 71 Utah 112, 263 P.78, 81 (1927)). Put another way, in states that treat wrongful death actions as completely derivative of the underlying personal injury claim, the decedent's heirs "'stand in the shoes' that shod the decedent while he was alive." *Bybee*, 2008 UT 35, ¶ 22. But in Utah, "[t]he independent nature of the wrongful death cause of action . . . means that in our state the heirs in a wrongful death action stand in, at most, one shoe of the decedent." *Id.* ¶ 23. Whether a defense to the decedent's underlying personal injury claim can be applied to an heir's wrongful death claim depends on which shoe the defense fits.

*B. A Defendant in a Wrongful Death Action Can Assert Defenses*
*that Implicate the Viability of the Underlying*
*Personal Injury Action*

¶21 Given the semi-derivative nature of a wrongful death claim, Utah courts have analyzed on a case-by-case basis whether certain defenses applicable to the underlying personal injury claim can apply to a wrongful death claim. "A wrongful death plaintiff is not exposed to all of the defendant's defenses, but rather is 'subject to at least some of the defenses that would have been available against the decedent had she lived to maintain her own action.'" *Bybee*, 2008 UT 35, ¶ 21 (quoting *Jensen v. IHC Hosps., Inc.*, 944 P.2d 327, 332 (Utah 1997)). A defendant may assert defenses that "go to the viability of the underlying personal injury action." *Id.* ¶ 24. A brief review of our jurisprudence in this area informs our analysis.

¶22 In *Van Wagoner v. Union Pacific Railroad Co.*, a train struck a vehicle crossing the tracks, killing the vehicle's driver. 186 P.2d 293, 294 (Utah 1947). The question before this court was whether a defense of contributory negligence could apply to a wrongful death claim brought by the decedent's family. *Id.* at 303–04. The court reasoned that while the wrongful death statute vests in a decedent's heirs a cause of action, their losses "arise out of the death of the deceased," and the word "wrongful is used in the sense of wrongful as against the deceased." *Id.* at 303. Therefore, the wrongful death action is not truly independent of the underlying personal injury. *See id.* Further, the legislature did not intend the statute to modify in any way the rights of third parties, such as the defendant. *Id.* Therefore, the statute "grant[ed] to the heirs . . . a right to proceed against the wrongdoer subject to the defenses available against the deceased, had he lived and prosecuted the suit." *Id.* at 303–04.

¶23 Since *Van Wagoner*, this court has followed its reasoning while slightly narrowing its holding. In *Kelson v. Salt Lake County*, we quoted *Van Wagoner* to hold that a defendant may assert a statutory defense of contributory negligence to a wrongful death claim. 784 P.2d 1152, 1155 (Utah 1989). Eight years later, we reinforced *Van Wagoner* and *Kelson*, saying, "Utah law is clear that a plaintiff in a wrongful death action is subject to defenses which could have been asserted against the decedent had he lived and prosecuted the suit." *Hirpa v. IHC Hosps., Inc.*, 948 P.2d 785, 794 (Utah 1997) (citing *Kelson*, 784 P.2d at 1155) (holding the Good Samaritan Act, which shields medical providers from liability when voluntarily lending aid in an emergency, provided a defense to a wrongful death claim). However, we addressed the same issue

earlier that same year and employed narrower language. In *Jensen v. IHC Hospitals, Inc.*, we recognized the semi-derivative nature of a wrongful death action and stated that it "may only proceed subject to *at least some* of the defenses that would have been available against the decedent had she lived to maintain her own action." 944 P.2d 327, 332 (emphasis added). Nevertheless, we held there that a statute of limitations applicable to the decedent's underlying medical malpractice claim also barred the family's wrongful death claim. *Id.*

¶24 In *Bybee v. Abdulla*, we addressed whether an arbitration agreement between a decedent patient and his doctor also bound his heirs seeking to later bring a wrongful death action. 2008 UT 35, ¶¶ 2–6. After discussing the historical nature of the wrongful death claim, *id.* ¶ 18, we indicated that *Jensen* intentionally narrowed the language of *Van Wagoner* and its progeny. *Id.* ¶ 21. "[I]n Jensen we granted injured persons a more modest array of powers to bind their heirs should their death give rise to a wrongful death action." *Id*. And we repeated *Jensen*'s statement that a wrongful death plaintiff may only proceed "subject to at least some of the defenses" applicable to the underlying personal injury claim. *Id* (citation omitted). The court then explained that the comparative negligence statute in *Kelson*, the statute of limitations defense in *Jensen*, and the Good Samaritan Act in *Hirpa* were all defenses that "go to the viability of the underlying personal injury action." *Id.* ¶ 24. In contrast, "an agreement to bind heirs to arbitrate disputes does not implicate the viability of the underlying claim." *Id.* (citation omitted). We concluded our analysis by declining to adopt a categorical rule of which defenses would be available to a wrongful death defendant, but we noted that "those least likely to be found enforceable are contract provisions that purport to affect the rights of heirs but do not affect the existence of the decedent's personal injury claim during his lifetime." *Id.* ¶ 25. Thus, we held the arbitration agreement did not bind the family's wrongful death claim. *Id.* In so doing, we rejected for the first time the application to a wrongful death claim of a defense that would have otherwise been applicable to a decedent's underlying personal injury claim.

¶25 Most recently, we addressed a new wrinkle on this issue in *Riggs*. There, we analyzed whether a judgment for a personal injury claim obtained by an injured plaintiff precluded her family from bringing a wrongful death claim for the same injury after she died. 2015 UT 17, ¶ 8. We differentiated the case from *Jensen* and *Bybee* because "[o]ur analysis in those cases was . . . driven by the need to choose between conflicting laws"—the statutory defense at issue in each case and the wrongful death statute. *Id.* ¶ 15. Because

no statutory conflict existed in *Riggs*, we held that "under the plain language of [the wrongful death statute], the wrongful death cause of action is not barred by a decedent's prior personal injury" judgment. *Id.*

¶26    Having surveyed our body of law in this area, we now turn to where along the *Van Wagoner–Riggs* continuum the present case fits.

*C. Section 401 May Bar the Feldmans' Wrongful Death Claims
Because It Implicates the Viability of Ms. Feldman's
Underlying Personal Injury Claim[5]*

¶27    Recognizing that a wrongful death plaintiff is not subject to *all* the defenses that would have been available against the decedent's underlying personal injury action, we nonetheless hold that section 401 applies to the Feldmans' wrongful death action.

¶28    The present case fits the *Kelson/Hirpa/Jensen* analysis for two main reasons. First, section 401 provides a defense that implicates the viability of an underlying claim for personal injury. No party disputes that, had Ms. Feldman survived and only been injured, she would have a claim "for personal injury" within the meaning of section 401. And because of this, the statute would bar her claim (assuming all other elements of the statute were satisfied). In other words, section 401—unlike the arbitration agreement in *Bybee*—would "affect the existence of [Ms. Feldmans'] personal injury claim during [her] lifetime."

¶29 Second, this case also presents us with a potential statutory conflict. On one hand, the wrongful death statute provides that when a person's death is "caused by the wrongful act or neglect of another," her heirs may maintain an action for damages. On the other hand, section 401 provides a defense against the underlying personal injury claim. If we again assume that Ms. Feldman had lived and section 401 barred her claims, the City's conduct would not be legally "wrongful" or negligent. It would therefore be bizarre to hold that whether the City's actions were "wrongful" under the wrongful death statute turned on whether

---

[5] The City also argues that section 401 applies because, under *Gressman v. State*, "a statutory reference to 'personal injury' claims includes all personal torts," 2013 UT 63, ¶ 31, 323 P.3d 998, of which wrongful death is one. Because we affirm today on alternate grounds, *see infra* ¶¶ 27–29, we need not decide whether "personal injury" in section 401 encompasses all personal torts.

Ms. Feldman survived her injuries. We avoid this logical tangle by holding that section 401 provides a specific statutory defense to the wrongful death statute's general right to bring such claims.

## II. APPLICATION OF SECTION 401 DOES NOT VIOLATE THE WRONGFUL DEATH CLAUSE OF THE UTAH CONSTITUTION

¶30   In an alternative yet related argument, the Feldmans argue that if section 401 does preclude their wrongful death action, it violates the Wrongful Death Clause of the Utah Constitution. That provision provides, in relevant part, that "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated . . . ." UTAH CONST. art. XVI, § 5.

¶31   Under the Wrongful Death Clause, the legislature may not repeal its wrongful death statute or "nullify the wrongful death action by indirect means." *Hirpa v. IHC Hosps., Inc.*, 948 P.2d 785, 794 (Utah 1997). Nonetheless, as we saw in part I, *see supra* ¶¶ 22–26, "the Legislature . . . may provide for reasonable defenses that are not inconsistent with the fundamental nature of the wrongful death action itself."[6] *Id.* (quoting *Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 685 (Utah 1985)). And a defendant may raise defenses that "go to the viability of the underlying personal injury action." *Bybee v. Abdulla*, 2008 UT 35, ¶ 24, 189 P.3d 40.[7]

---

[6] We note here that the Feldmans argue section 401 is unconstitutional because, at the time the Constitution was adopted in 1895, sovereign immunity did not apply to municipalities or recreational landowners, who had a common law duty of care to invitees and licensees. However, the allowance for reasonable defenses articulated in *Hirpa* and *Berry* does not distinguish between types of defendants to whom the defenses can apply. The Feldmans do not ask us to overrule these cases. And even if they did, their arguments would fall short of the "deep immersion" in the ratification era required to interpret our constitutional provisions. *See So. Salt Lake City v. Maese*, 2019 UT 58, ¶ 23, 450 P.3d 1092 (quoting *Neese v. Utah Bd. of Pardons & Parole,* 2017 UT 89, ¶ 98, 416 P.3d 663).

[7] The Feldmans also argue that the legislature intended "personal injury" in section 401 to not include wrongful death claims in order to avoid infringing upon the Wrongful Death Clause. However, "[w]e presume the Legislature is aware of our case law," *Olseth v. Larson,* 2007 UT 29, ¶ 39, 158 P.3d 532, and can

(continued . . .)

¶32 Again, we analogize the case at bar to the plaintiff's claim in *Hirpa*. There, the plaintiff brought a wrongful death action against a hospital medical director who voluntarily assisted with the decedent's care around the time of death. 948 P.2d at 787. The medical director asserted a defense under Utah's Good Samaritan Act, which protects from "any civil damages" any licensed medical provider "who in good faith renders emergency care at the scene of an emergency." *Id.* at 788 (citing UTAH CODE § 58-12-23 (1996)). The court found the Act to be a "narrowly tailored" defense that serves an important public policy: incentivizing medical professionals to provide aid in an emergency. *See id.* at 793–94. Because the medical director had no preexisting duty to provide care to the decedent and the medical director could have asserted the Good Samaritan Act as a defense had the decedent lived, the Act was a "reasonable defense, not inconsistent with the fundamental nature of the wrongful death action." *Id.* at 788, 794.

¶33 This case falls squarely within the *Hirpa* analysis. Section 401 parallels the Good Samaritan Act in three material ways. First, it provides a narrowly tailored defense—it applies only when a landowner opens her land to the general public, free of charge, and a land user's injury is caused by an inherent risk of participating in an activity with a recreational purpose on that land. *See* UTAH CODE § 57-14-401 (2018). Second, it advances an important public interest—encouraging landowners to open their land to the public for recreational use.[8] Third, it only protects defendants who had no preexisting duty of care to a potential plaintiff.

---

therefore infer the legislature intended section 401 to be a "reasonable defense" to wrongful death claims. *Hirpa*, 948 P.2d at 794; *see also In re Estate of Hannifin*, 2013 UT 46, ¶36, 311 P.3d 1016 (Durham, J., dissenting) ("[W]e assume, absent a contrary indication, that the legislature intends its statutes to work in tandem with our case law, and we reconcile the common law with statutory law whenever possible.").

[8] The stated purpose of the Act is "to limit the liability of public and private land owners toward a person entering the owner's land as a trespasser or for recreational purposes, whether by permission or by operation of Title 73, Chapter 29, Public Waters Access Act." UTAH CODE § 57-14-101(2). As this court has explained, "[t]he Act encourages landowners to allow the public to use their land for recreational purposes by limiting landowners' liability to persons

(continued . . .)

¶34   The Feldmans attempt to distinguish the Act here from the Good Samaritan Act in *Hirpa* because the former "provides immunity to landowners who have always owed a common law duty of reasonable care to invitees on their property." This argument misses the mark. The whole point of the Act is to incentivize landowners who had no preexisting duty to open their land to the public to do so. And the Act accomplishes this purpose by expressly abrogating the common law duties of care that such a landowner would otherwise have to invitees or licensees on his property. *See, e.g.*, UTAH CODE § 57-14-401 (2019); *id.* § 57-14-201 (2018) ("[A]n owner of land owes no duty of care to keep the land safe for entry or use by any [user under the Act] or to give warning of a dangerous condition, use, structure, or activity on the land."); *id.* § 57-14-202 (An owner of land under the Act does not: (1) make any representation as to the safety of the land; (2) confer upon any user the legal status of invitee or licensee; or (3) assume responsibility or liability for any act or omission by any user).

¶35   As we explained above, *supra* ¶¶ 25, 29, section 401 provides a defense that "go[es] to the viability of the underlying personal injury action," because, had Ms. Feldman survived and pursued a personal injury claim, the statute would block her claim (assuming the other elements of section 401 were met). In the same way, the defense provided by section 401 is "not inconsistent with the fundamental nature of the wrongful death action." The statute only limits what is legally "wrongful as against the deceased." *See supra* ¶ 22 (quoting *Van Wagoner v. Union Pac. R.R. Co.*, 186 P.2d 293, 303 (Utah 1947). It does nothing to expressly limit the "fundamental nature" of the action—the right of heirs to bring an action and seek their own damages for the death of a family member caused by the "wrongful act" of another.

¶36   For these reasons, section 401 is a reasonable defense to the Feldmans' wrongful death claim. Thus, the City may assert the

---

who use the land." *Golding v. Ashley Cent. Irrigation Co.*, 902 P.2d 142, 145 (Utah 1995).
    We also note here that the Feldmans' interpretation of section 401—that it does not protect landowners from wrongful death actions—is incongruous with the Act's purpose and statutory scheme. Nothing in the Act suggests that the Utah legislature enacted it to simultaneously protect landowners from personal injury suits by their guests while also requiring those landowners to effectively extend life insurance to those same guests.

defense without violating the Wrongful Death Clause of the Utah Constitution.

## III. THE FELDMANS SUFFICIENTLY ALLEGE MS. FELDMAN'S DEATH WAS NOT CAUSED BY AN INHERENT RISK OF ENTERING THE CREEK

¶37 We have thus far determined that section 401 applies to wrongful death actions and does so without violating the Utah Constitution. That said, it is not apparent from the Feldmans' complaint that the statute actually bars their action here. Contrary to what the district court found, the Feldmans sufficiently alleged that Ms. Feldman's death was not caused by an inherent risk of entering the creek at the East Creek Access. To reach this determination, we identify the necessary statutory elements and apply the facts alleged to those elements.

¶38 Again, under section 401 of the Act, a "person may not make a claim against or recover from an owner of any land . . . opened to the general public without charge . . . for personal injury or property damage caused by the *inherent risks of participating in an activity with a recreational purpose on the land.*" UTAH CODE § 57-14-401(1) (2018) (emphasis added). Neither party disputes that the City owns the Park and opened it to the general public without charge. So, we focus on the elements "inherent risks" and "activity with a recreational purpose on the land." We begin with the latter element.

¶39 For starters, we must identify whether Ms. Feldman was participating in an "activity with a recreational purpose on the land." The Act provides: "'[r]ecreational purpose' includes, but is not limited to, any of the following or any combination thereof:" and proceeds to list nineteen activities, including "walking," "hiking," "swimming," and "viewing or enjoying . . . scenic . . . sites." UTAH CODE § 57-14-102(7) (2018). These enumerated activities are broad categories that describe a recreator's general purpose for entering the land. And each broad category necessarily includes the subset of all activities a recreator takes in furtherance of that general purpose. If a hiker encounters a cold stream and decides to wade across it, she does not cease "hiking" while crossing the stream. And if a person is "viewing or enjoying . . . scenic . . . sites," she does not cease doing so if she climbs a tree to get a better picture. In these examples, the recreator continues to participate in the "activity with a recreational purpose" even if crossing the stream or climbing the tree is not fun for that person. Therefore, we interpret "activity with a recreational purpose" to

mean a plaintiff's general purpose for entering the land and include all actions taken in furtherance of that purpose.

¶40 Here, Ms. Feldman entered the Park with the general purpose of walking with her dogs. This purpose falls squarely within the statutory definition of an "activity with a recreational purpose on the land." And that general purpose encompasses all actions taken in furtherance of it—including entering the creek.

¶41 Next, we must determine whether, based on the facts alleged, Ms. Feldman's drowning in the creek at the East Creek Access was an "inherent risk" of walking in the Park with her dogs. Here we disagree with the district court.

¶42 At the threshold, we must decide the relevant action for purposes of this analysis. As explained above, the "activity with a recreational purpose" includes all actions taken in furtherance of that general activity once on the land. But those actions may include risks not contemplated by the general activity. The hiker who crosses the stream risks drowning, a risk generally not associated with "hiking." And the viewer of scenic sites who climbs the tree risks falling and breaking a bone, a risk generally not associated with enjoying a scenic view. Because the set of risks inherent in a specific action taken in furtherance of a general recreational purpose may be very different from the risks inherent in that general purpose, we analyze the inherent risks of that specific action.

¶43 Here, Ms. Feldman's action of entering the creek, in furtherance of her general purpose of walking with her dogs, carried with it a set of inherent risks much different from the risks inherent in walking. As such, we analyze the "inherent risks" of entering the creek.

¶44 The Act defined "inherent risks" as "those dangers, conditions, and potentials for personal injury or property damage that are an integral and natural part of participating in an activity for a recreational purpose." UTAH CODE § 57-14-102(3) (2018). Much like section 401 itself, several necessary elements lurk within this definition. We must analyze (1) whether the creek constituted a "danger[], condition[], [or] potential[] for personal injury," *id.*, and (2) if so, whether that danger was an "integral and natural part" of walking dogs in the Park. *Id.*

¶45 Regarding the first element, the Feldmans allege that Ms. Feldman drowned due to a "dangerous current at the creek." The fact that she drowned supports this allegation. The "danger[], condition[], [or] potential[] for personal injury" element is satisfied.

¶46 The second element is trickier. The Feldmans argue that "Liudmila's death was not caused by a natural or integral part of the creek," but rather "by a manmade condition that resulted in the dangerous current." The City responds with three points: (1) the Act clearly "applies to manmade improvements because it applies to land that is 'developed or improved'"; (2) the Act "defines 'inherent risks' in terms of the risks associated with participating in a recreational activity, not in terms of whether the injury was caused by a natural or manmade condition on the land"; and (3) under *Golding v. Ashley Central Irrigation Co.*, 902 P.2d 142 (Utah 1995), the Act's protections are not "limited to injuries caused by purely natural conditions on the land . . . ."

¶47 What it means for a danger to be an "an integral and natural part" of participating in an activity with a recreational purpose under the Act is an issue of first impression for this court. Because the Act applies to a broad range of recreational activities, the answer to this inquiry will necessarily depend on the activity itself.

¶48 The Feldmans analogize this issue to *Clover v. Snowbird Ski Resort*, 808 P.2d 1037 (Utah 1991).[9] There, we interpreted the meaning of "inherent risks of skiing"—defined as "those dangers or conditions which are an integral part of the sport of skiing"—under the Inherent Risks of Skiing Act (IRSA). *Id.* at 1044 (quoting Utah Code Ann. § 78-27-52(1) (renumbered as § 78B-4-402(1)). While the language of inherent risks in the IRSA is similar to that of the Act here, *Clover* is nonetheless unhelpful here for two reasons. First, "the legislature is undoubtedly empowered to define [a statutory term] in different ways in different statutory schemes." *Tesla Motors UT, Inc. v. Utah Tax Comm'n*, 2017 UT 18, ¶ 23, 398 P.3d 55. And these two statutory schemes serve different purposes: the purpose of the IRSA was "to *clarify the law*" regarding ski area liability, *see Clover*, 808 P.2d at 1044 (emphasis added) (citation omitted), whereas the purpose of the Act here is "to *limit the liability* of public and private land owners" who allow public users to recreate on their land. Utah Code § 57-14-101(2) (emphasis added).[10] Second,

---

[9] We recently clarified our *Clover* analysis in *Rutherford v. Talisker Canyons Finance, Co.*, 2019 UT 27, 445 P.3d 474, but the difference is irrelevant here.

[10] While the interpretation of a defined term in one statute may be persuasive in the interpretation of a similar term in a similar statute, "the presumption of consistent usage can hardly be said to

(continued . . .)

the IRSA applied to a single activity: skiing. For this reason, we could further refine a test of what is an "integral part" of the activity of skiing. The Act here, however, applies to many different recreational activities, and the scope of the inherent risks depends on the activity.

¶49   To understand what is meant by "integral" and "natural," we look to the use of these words as legal terms of art in the doctrine of primary implied assumption of risk. This doctrine "involves a relationship in which [the] defendant simply owes no duty of care to the plaintiff." *Rutherford v. Talisker Canyons Finance, Co.*, 2019 UT 27, ¶ 46, 445 P.3d 474 (alteration in original) (citation omitted). It "applies when a person is 'injured as a consequence of being exposed to a risk which the [defendant] in the exercise of due care could not avoid.'" *Id.* (alteration in original) (quoting *Tiller v. Atl. Coast Line R.R. Co.*, 318 U.S. 54, 71 (1943) (Frankfurter, J., concurring). And Utah courts and other jurisdictions frequently describe such a risk as one that is "integral" or "natural" to the relevant activity.[11] Because these words are established terms of art in the doctrine of primary implied assumption of risk—a doctrine essentially codified in the Act—we presume the legislature intended to preserve those established meanings. *See Maxfield v.*

---

apply across the whole *corpus juris*." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 172–73 (2012).

[11] *See, e.g.*, *Lawson ex rel. Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013, 1016 (Utah 1995) (explaining that "being struck by a foul ball is 'one of the natural risks assumed by spectators attending professional games,'" and thus the owners of a baseball team owed no duty of care to the plaintiff (citation omitted)); *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1061 (9th Cir. 2018) ("[A] person or entity does not owe a duty of care . . . where 'conditions or conduct that otherwise might be viewed as dangerous . . . are an integral part of the sport itself.'"); *Mamati v. City of New York Parks & Recreation*, 123 A.D.3d 671, 671–72 (N.Y. App. Div. 2014) ("Under the doctrine of primary assumption of risk, a person who voluntarily participates in a . . . recreational activity generally consents, by his or her participation, to those injury-causing events, conditions, and risks which are inherent in and arise out of the nature of the activity. Risks inherent in a sporting activity are those which are known, apparent, natural, or reasonably foreseeable consequences of the participation." (citations omitted)).

*Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 ("[W]hen a word or phrase is transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." (citation omitted) (internal quotation marks omitted)).

¶50　The parties seemingly do not dispute the meaning of the word "integral" here, only its application to the facts. They do, however, dispute the meaning of "natural." The Feldmans essentially argue that "natural" refers only to things that exist in the ordinary course of nature; thus, the dangerous current in the creek "cannot be 'natural' because it is manmade." The City responds that section 401 applies equally to manmade and non-manmade risks because it applies to land that is "developed or improved."

¶51　We think the proper reading of the statute is somewhere in between. "Natural," as used in the context of assumption of risk, focuses on whether a given risk is expected in a given setting. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS § 496D, cmt. b (1965) (explaining that for a plaintiff to assume a risk, "he must not only be aware of the facts which create the danger, but must also appreciate the danger itself and the nature, character, and extent which make it unreasonable"); *Lawson ex rel. Lawson v. Salt Lake Trappers, Inc.*, 901 P.2d 1013, 1016 (Utah 1995) (explaining that "being struck by a foul ball is 'one of the natural risks assumed by spectators attending professional games'" (citation omitted)); *Abee v. Stone Mountain Mem'l Ass'n*, 312 S.E.2d 142, 145 (Ga. Ct. App. 1983) (holding plaintiff assumed the risk where the danger was not "'a result of obscure or unobservable risks, unexpected dangers or unseen defects' but was [the] result of a natural and obvious hazard necessary to the purpose" of the activity), *aff'd*, 252 Ga. 465, 314 S.E.2d 444 (1984). And, as explained above, we presume the legislature's intended meaning of "natural" in the statute aligns with its established meaning as a legal term of art.

¶52　We also reject the Feldmans' interpretation because it would undermine the entire Act, which is designed to extend broad protections to landowners who open up their land to public use. Almost every park or trail contains extensive human-altered features, and the Feldmans' reading of "natural" would render the Act virtually inapplicable to these lands. We doubt the legislature intended an interpretation of "natural" that neutralizes most of the Act's application. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.")

¶53　Applying the legal term of art meaning of "natural" to the Act as a whole, a risk is an "integral and natural part" of a given

activity if that risk would be expected in the given setting. And the manmade aspect of a risk may be probative—but likely not dispositive—of the expectedness of that risk. For example, tripping over a rock in a trail cleared by a chainsaw and scraped clean with a rake would certainly be an inherent risk of walking on a trail, even though the trail is manmade. But electrocution by an exposed electric wire dangling from a tree on that same trail would not be an inherent risk of walking on a trail.

¶54 Which brings us, finally, to the Feldmans. Was the possibility of drowning in the creek at the East Creek Access an "integral and natural part" of entering the creek? That question cannot be answered on the face of the Feldmans' complaint—or on a motion to dismiss it. The complaint essentially alleges that: the Feldmans were with their dogs at the park; the dogs went into the water; and when Ms. Feldman entered the water to rescue the dogs, she drowned due to a dangerous current caused by manmade developments in the area. These allegations must be accepted as true on a motion to dismiss. And the allegations themselves cannot establish conclusively that the risk Ms. Feldman encountered was expected in this setting. We reverse and remand on this basis.

## CONCLUSION

¶55 The district court correctly held that section 401 of the Limitations on Landowner Liability Act can bar the Feldmans' wrongful death claims and does not violate the Utah Constitution. But it erred in granting the City's motion to dismiss because the Feldmans sufficiently alleged that Ms. Feldman's tragic drowning was not caused by a risk inherent in her recreational activity, *i.e.*, walking in the Park with her dogs. Therefore, we reverse the dismissal of all claims and remand for further proceedings consistent with this opinion.