**AMENDED OPINION**[*]

*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 49**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

TALISKER PARTNERSHIP, *et al.*,[*]
*Appellants,*

*v.*

MIDTOWN ACQUISITIONS L.P. and WELLS FARGO BANK, N.A.,
*Appellees.*

No. 20240553
Heard May 7, 2025
Filed October 30, 2025

On Direct Appeal

Third District Court, Summit County
The Honorable Richard E. Mrazik
No. 230500060

Attorneys:

P. Bruce Badger, Jason W. Hardin, Artemis D. Vamianakis, Tanner J. Bean, Thomas B. Stockard, Salt Lake City, for appellants

Matthew L. Lalli, Troy J. Aramburu, David G. Barker, Ben T. Welch, Bret R. Evans, Cameron J. Cutler, Salt Lake City, for appellee Midtown Acquisitions L.P.

---

[*] Talisker filed a petition for rehearing after we published our original opinion. We grant the petition in part and modify paragraphs 21, 29, and 30, add a new footnote four, and revise what have become footnotes five and six.

[*] Additional appellants: Talisker Investments (Canada) Inc.; Talisker Investments (U.S.) Inc.; Talisker Developments Inc.; United Park City Mines Company; Tuhaye LLC; Tuhaye Golf, LLC; Mountain Resorts Development (Pioche), LLC; Mountain Developments I, Inc.; Tower Club LLC; Tuhaye Elm, Inc.; Talisker Club, LLC; and Talisker Finance, LLC.

George W. Pratt, Jack Darrington, Salt Lake City, for appellee, Wells Fargo Bank, N.A.

———————————

ASSOCIATE CHIEF JUSTICE PEARCE authored the opinion of the Court, in which CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

———————————

ASSOCIATE CHIEF JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1   Several years ago, Talisker Finance, LLC, and its affiliates (collectively, Talisker) defaulted on a $150 million loan that was secured by real property. The lending parties, Wells Fargo Bank, N.A. (Wells Fargo), and Midtown Acquisitions L.P. (Midtown) (collectively, Lenders), foreclosed on the collateral property and purchased it themselves at two sheriff's sales. The sale price failed to satisfy the debt. Lenders continue to seek the remaining balance from Talisker.

¶2   Through subsequent litigation, Talisker came to believe that Lenders had depressed the price of the collateral by colluding with the court-appointed receiver (Receiver) and deterring at least one interested party from attending the sales. Talisker also accuses Lenders of grouping the properties into bundles that made them less attractive to potential bidders.

¶3   Talisker sued Lenders, seeking equitable relief from the judgments that obligate them to repay the remainder of the loan. Lenders moved to dismiss, arguing, among other things, that Talisker waived all of the rights Lenders allegedly violated. The district court agreed and dismissed. We affirm the district court's ruling.

## BACKGROUND[1]

¶4   In 2006, Talisker borrowed $100 million from Wells Fargo and Bank of Scotland PLC. Talisker borrowed the money to

———————————

[1] "When reviewing a rule 12(b)(6) motion to dismiss, we accept the factual allegations in the complaint as true and interpret those facts, and all reasonable inferences drawn therefrom, in a light most favorable to the plaintiff as the nonmoving party." *Feldman v. Salt Lake City Corp.*, 2021 UT 4, ¶ 2 n.1, 484 P.3d 1134 (cleaned up). We

(continued . . .)

develop various real estate parcels it owned across Wasatch, Summit, and Salt Lake counties. It secured the loan in part by pledging those very parcels as collateral.

¶5    The parties renegotiated the loan several times over the years. They first upped the loan's total to $150 million. Later, as Talisker experienced difficulties in repaying the loan, they postponed the due date several times. The identity of the lending parties also changed. The Bank of Scotland assigned its interest to Goldman Sachs, which in turn assigned it to Midtown.[2]

¶6    Across both originating and modifying documents, Talisker waived several rights it might have otherwise had in the event of default. Two of these waivers are important here:

- Talisker broadly "waive[d] any and all rights and defenses that [it] may have because [its] debt is secured by real property." That waiver repeatedly insisted upon its breadth, noting that it was "unconditional and irrevocable" and that the "rights and defenses being waived include, but are not limited to, any rights or defenses based on applicable statutes." It cited several examples of waived rights but noted that in doing so it did not intend to "limit[] the generality" of the waiver.

- Talisker conferred on Lenders "the right to sell" the collateral property "as a whole or in separate parcels, in any order that [Lenders] may designate." Or, as stated in a different agreement, Talisker "waive[d] and relinquishe[d] . . . any right . . . to direct the order or method of sale or liquidation of the Collateral in one or more judicial foreclosure sales."

¶7    By 2014, Talisker found itself unable to repay the loans or to postpone their maturation any longer. Lenders initiated foreclosure proceedings. After obtaining judgments against Talisker, Lenders directed the sheriffs of Wasatch and Summit counties to sell the collateral property located in those counties.

_____

recite the facts in this light but emphasize that none of these background statements have leveled up from allegation to established fact.

[2] Wells Fargo, as the loan's administrative agent, sometimes took actions on behalf of both itself and Midtown. For simplicity's sake, we attribute these actions to Lenders.

Ultimately, the property was sold in two bulk sales. At each, Lenders were the only bidders. The sale of the collateral and other property failed to cover the loan amount, and Lenders have continued to pursue the balance from Talisker.

¶8 In late 2022, during other litigation, Talisker unearthed new information about Lenders' conduct during the foreclosure proceedings and sheriff's sales. Talisker learned that Lenders had signed a Common Interest Agreement with Receiver. In it, Lenders and Receiver agreed to act against "common potential adversaries," including Talisker.

¶9 In the run-up to the sheriff's sales, Lenders and Receiver took several potentially dubious actions under cover of the Common Interest Agreement. For example, in a memo, Lenders' counsel advised both Lenders and Receiver that Talisker might not have waived Utah Rule of Civil Procedure 69B(d)'s directive that the properties in a sheriff's sale "must be sold in such parcels as are likely to bring the highest price." Counsel suggested that Lenders could "seek an order" blessing their preferred disposition of the property as the approach "likely to bring the highest price." But Lenders did not pursue the course the memo suggested, and Receiver never informed the court of the potential issue the memo had flagged. Additionally, Lenders commissioned an appraisal which suggested that the collateral property was worth far more than what Lenders eventually paid for it. Finally, before the sale, Receiver learned of a party who was interested in purchasing some of the collateral property. But Lenders asked Receiver to "stall that purchase" until after the conclusion of the sheriff's sales, and Receiver complied.

¶10 Talisker sued Lenders in 2023, seeking equitable relief under Utah Rule of Civil Procedure 60. Talisker alleged that Lenders' and Receiver's "conduct in relation to the two sheriff's sales" suggested that they knowingly flouted the requirements of rule 69B(d) to acquire the collateral property at "artificially low prices." Much of Talisker's complaint focused on Receiver's breach of her duties of impartiality as an officer of the court, even though Receiver was not a party to the case. Talisker also alleged that Lenders acquired a duty to see the provisions of rule 69B(d) carried out through a contractual provision that required any "sale by foreclosure" to be conducted "in accordance with applicable law."

¶11 Talisker believed that "too much time likely ha[d] elapsed to overturn the sheriff's sales." *See generally Pyper v. Bond*, 2011 UT

45, 258 P.3d 575 (recognizing that a court may set aside a sheriff's sale based on gross inadequacy of price and irregularities in the sale process). So Talisker instead asked for relief from the underlying judgments or, in the alternative, for the court to debit the true value of the collateral property against the judgments on the grounds that the sheriff's sales were tainted by fraud, fraud upon the court, or, "at a minimum, . . . egregious and grossly inequitable" conduct.

¶12 Lenders moved to dismiss. They argued that Talisker waived the rights Lenders allegedly infringed. The district court agreed and granted the motions. The court accepted Talisker's factual allegations as true for purposes of the motion and concluded that Lenders' treatment of Talisker was possibly unfair — but not unlawful. The court recognized that the judgments "provided that the applicable provisions of . . . [r]ule 69B would apply," but noted that

> the Loan Documents limited which provision of [r]ule 69B(d) were applicable. That limitation provided that the Lenders could elect, at their discretion, whether to proceed with, or direct the Sheriff to conduct, a bulk sale. That is what the Lenders did. An auction occurred . . . and the applicable provisions of [r]ule 69B were followed.[3]

The court further concluded that the complaint failed to allege "any unlawful irregularity in the auction[s]" of the collateral property.

## ISSUE AND STANDARD OF REVIEW

¶13 Talisker argues that the district court erred when it dismissed its complaint. Talisker maintains that it did not waive all relevant protections of Utah Rule of Civil Procedure 69B and, in any event, retained a right to equitable relief under our caselaw. "We review a decision granting a motion to dismiss for correctness, granting no deference to the decision of the district court." *Amundsen v. Univ. of Utah*, 2019 UT 49, ¶ 20, 448 P.3d 1224 (cleaned up).

## ANALYSIS

¶14 Talisker first contends that the district court erred when it concluded that the two sheriff's sales that disposed of most of the

---

[3] The district court "expresse[d] no opinion as to whether the Receiver in this case breached any duties." Nor do we. *See infra* ¶ 29 n.5.

collateral property complied with the applicable provisions of rule 69B(d) of the Utah Rules of Civil Procedure. The force of this argument turns on which of the rule's many provisions were applicable to the sales.

¶15 Talisker concedes that it waived at least two provisions: the right to "direct the order in which the property [was] sold" and the requirement that "[s]everable lots of real property must be sold separately." *See* UTAH R. CIV. P. 69B(d). But Talisker maintains that it never waived rule 69B(d)'s requirement that "property must be sold in such parcels as are likely to bring the highest price." *See id.* Talisker labels this provision "the highest-price requirement."

¶16 The district court was not convinced by Talisker's argument, and neither are we. Talisker's general waiver of all rights associated with a debt "secured by real property" is broad enough to encompass the highest-price provision. And its waiver of "any right . . . to direct the *order or method of sale* or liquidation of the Collateral in one or more judicial foreclosure sales" clearly references the concepts embodied in rule 69B(d). (Emphasis added.)

¶17 "A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit or advantage, a knowledge of its existence, and an intention to relinquish it." *ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2010 UT 65, ¶ 26, 245 P.3d 184 (cleaned up). Talisker argues that rule 69B(d) gives rise to "statutory" or "statutorily guaranteed" rights. Under caselaw from our court of appeals, waivers of statutory rights are subject to a higher standard; they must be "explicitly stated, so that the parties' intent is clear and unmistakable." *Pioneer Builders Co. of Nev. v. K D A Corp.*, 2018 UT App 206, ¶ 12, 437 P.3d 539 (cleaned up). A waiver may satisfy that standard "either by explicit reference to the statute or . . . by a clear reference to the concept" the statute embodies. *Medley v. Medley*, 2004 UT App 179, ¶ 10, 93 P.3d 847.

¶18 We note that we have not adopted this general standard. We will nevertheless assume *arguendo* that it applies because under either it or our ordinary waiver standard, Talisker expressly waived any rights that might have furnished a cause of action against Lenders.

¶19 Across several documents, Talisker waived "*any and all* rights and defenses that [it] may have because [its] debt is secured by real property." (Emphasis added.) The parties' contracts did not

name every right or defense that might arise from debts "secured by real property."

¶20 But in context of the loan documents, that phrase surely encompasses all rights associated with foreclosure. The documents define it in part by reference to two examples, each of which relates to foreclosure: one governs the foreclosure process directly, while the other gives Lenders a right to collect prior to foreclosure. Beyond these examples, the documents underscore that the waiver is broad and inclusive, noting that "rights and defenses being waived include, but are not limited to, any rights or defenses based on applicable statutes." Talisker elsewhere acknowledges that "numerous possible defenses to the enforceability of [Talisker's] obligations may presently exist and/or may arise hereafter" and that Lenders "specifically bargained for the waiver and relinquishment by [Talisker] of *all* such defenses." (Emphasis added.)

¶21 At oral argument, Talisker urged us to look at the "full picture of all of the loan documents" to determine whether some language in them might indicate that the waivers were not intended to sweep as broadly as their plain language might suggest. But Talisker did not point to any provision in the loan documents with that sort of limiting effect in its briefing. Nor did it do so in response to questioning at oral argument.[4]

¶22 Even if the general waiver insufficiently stated or referenced the so-called highest-price provision, Talisker specifically waived many of rule 69B(d)'s requirements for foreclosure sales. We turn first to the text of rule 69B(d), emphasizing the highest-price provision:

> **Conduct of [sheriff's] sale.** All sales must be at auction to the highest bidder, Monday through Saturday, legal holidays excluded, between the hours of 9:00 a.m. and 8:00 p.m. at a place reasonably convenient to the public. Real property must be sold at the district courthouse of the county in which the property is located. The officer must sell only so much property as is necessary to satisfy the amount

---

[4] We do not address arguments that Talisker raises for the first time in its petition for rehearing. *See State v. Goins*, 2017 UT 61, ¶ 54, 423 P.3d 1236 ("Appellate courts should not consider claims that are presented for the first time in petitions for rehearing.").

due. The officer must not purchase property or be interested in any purchase. Property capable of delivery must be within view of those who attend the sale. *The property must be sold in such parcels as are likely to bring the highest price.* Severable lots of real property must be sold separately. Real property claimed by a third party must be sold separately if requested by the third party. The defendant may direct the order in which the property is sold.

UTAH R. CIV. P. 69B(d) (emphasis added).

¶23 Talisker "waive[d] and relinquishe[d] . . . any right. . . to direct the *order or method of sale* or liquidation of the Collateral in one or more judicial foreclosure sales." (Emphasis added.) Talisker concedes that this language encompasses at least two provisions of rule 69B(d): the defendant's right to "direct the order in which the property is sold" and the requirement that "[s]everable lots of real property must be sold separately." *See* UTAH R. CIV. P. 69B(d). But Talisker resists the application of this waiver to the highest-price provision. It defines the concededly waived requirements in narrowly mechanical terms—as relating only to the "*sequence* of selling property" and the "*ability* to bundle severable lots." In other words, Talisker asserts that the waiver concerned only the *organization* of the sales without changing their underlying *goal*, as enshrined by the highest-price provision. That is, Talisker contends it was only waiving the right to have the properties sold individually if Lenders could establish that selling them in bulk would yield a higher price.

¶24 Viewed in context of the rule, this distinction is untenable. To begin with, the highest-price provision itself is not, as Talisker occasionally characterizes it, a free-floating mandate that every aspect of a sheriff's sale be conducted with the goal of securing the highest price. Rather, the provision takes the form of a directive specific to bundling: "The property must be sold *in such parcels* as are likely to bring the highest price." UTAH R. CIV. P. 69B(d) (emphasis added). Just like the sequencing and anti-bundling provisions, then, the highest-price provision pertains on its face to "the order or method of sale" and is therefore amply covered by Talisker's waiver of "any right[s]" it might have had to direct such decisions.

¶25 The highest-price provision is not different because it names its purpose. Although not stated in the text of the rule, the

sequencing and anti-bundling provisions share the same purpose: to increase the likelihood that sheriff's sales will generate the highest possible price. We know this because, in some sense, *all* of rule 69B(d)'s provisions are designed to help maximize the price of any property sold: "The purpose of a [sheriff's] sale is to evolve the full value of the property exposed by fairness and competition and to produce that value in the form of money." *Nat'l Oil & Gas, Inc. v. Gingrich*, 716 N.E.2d 491, 495 (Ind. Ct. App. 1999); *see also Cocks v. Izard*, 74 U.S. (7 Wall.) 559, 562 (1868) ("The law . . . accords to every debtor the chance for a fair sale and full price . . . .").

¶26 Simply stated, when Talisker waived "any and all rights and defenses that [it] may have because [its] debt is secured by real property" and "any right . . . to direct the order or method of sale," it waived the right to complain about a decision to bundle the properties for sale.

¶27 This is not quite the end of the matter. Talisker further claims it is entitled to equitable relief from the sheriff's sale because the sale featured "gross inadequacy of price" alongside "irregularities" and "circumstance of unfairness . . . caused by the conduct of the party benefitted by the sale." *See Pyper v. Bond*, 2011 UT 45, ¶¶ 11, 15, 258 P.3d 575. The district court referenced and rejected this *Pyper*-based argument when it concluded that no "unlawful irregularity" attended the sale.

¶28 Talisker disputes this conclusion on two related grounds. It first argues that Lenders' and Receiver's behavior violated other laws in addition to rule 69B(d). In particular, (1) the Common Interest Agreement allegedly violated Receiver's duties under the Utah Rules of Civil Procedure and various court orders in the foreclosure proceedings, and (2) Lenders' alleged attempt to chill the bidding violated common law equitable principles. To make this argument work, Talisker asserts a few contestable premises— that Receiver's actions are relevant to a claim against Lenders if Lenders directed them; that the common law provides a guarantee against all manner of unfair practices; and that this guarantee overlaps with, but stands apart from, rule 69B(d) or any other contractual or statutory provisions governing sheriff's sales. Talisker next argues that an equitable remedy remained to it even if Lenders' behavior were "permitted by law." We construe this as an argument that even *lawful* "irregularities" in a sheriffs' sale are actionable under *Pyper* if those irregularities resulted in an unfair sale.

¶29 The broad language of Talisker's waivers dispenses with both arguments without any need to reach their underlying premises. As noted above, Talisker agreed that "numerous possible defenses to the enforceability of [its] obligations may presently exist and/or may arise hereafter" and that Lenders "specifically bargained for the waiver and relinquishment by [Talisker] of *all* such defenses." (Emphasis added.) This is part of what we take the district court to have referenced when it dismissed these claims by concluding that the "undisputed language in the [p]arties' loan agreements writ large . . . create[d] a legal landscape within which [Lenders'] actions were lawful" and that the amended complaint failed to allege any "unlawful" irregularities in the auction process.

¶30 Talisker bore a burden of persuasion to convince us that this conclusion was error.[5] Talisker has not sustained its burden of demonstrating that the district court erred when it concluded that Talisker had waived any claims based in equity or the common law.[6]

---

[5] For the same reason, we need not decide whether or under what circumstances a receiver's actions might be relevant to a suit framed like Talisker's.

[6] In some circumstances—"such as mistake, fraud, duress, or unconscionability," *Com. Real Est. Inv., L.C. v. Comcast of Utah II, Inc.*, 2012 UT 49, ¶ 40, 285 P.3d 1193—courts will relieve a party from the effects of "flagrantly unjust agreements," *Bekins Bar V Ranch v. Huth*, 664 P.2d 455, 459 (Utah 1983).

In this lawsuit, Talisker has not challenged the enforceability of its waivers on any of these grounds—often called "formation defenses." *See, e.g.*, Val Ricks, *Consideration and the Formation Defenses*, 62 U. KAN. L. REV. 315, 315 (2013). Talisker's briefs do not mention mistake, duress, or unconscionability at all. Talisker does, of course, argue that the judgments were marred by fraud. But it does not argue that the documents in which it waived the right to pursue a recovery based on that—or any other—theory were procured by fraud.

In its complaint, Talisker informed the district court that it had challenged "[a]t least some of the Loan Documents" as void and unenforceable in another civil action. But Talisker did not reference or reassert this caveat in its appellate briefing. Accordingly, we do not know the outcome of that challenge.

(continued . . .)

**CONCLUSION**

¶31 Talisker alleges that Lenders engaged in a plethora of unsavory behaviors to buy up Talisker's collateral at bargain prices. Although we do not condone the alleged behaviors, we conclude that Talisker's broad and categorical waivers left it without recourse. Affirmed.

————————

Nor do we opine on what the outcome would have been if Talisker had moved to set aside the sheriff's sales.